LESZEK M. SCHOENBORN *v.* MALGORZATA
SCHOENBORN
(AC 34446)

DiPentima, C. J., and Gruendel and Dupont, Js.

Argued May 20—officially released August 13, 2013

*Leszek M. Schoenborn*, self-represented, the appellant (plaintiff).

*W. Anthony Stevens, Jr.*, with whom was *Ronald T. Scott*, for the appellee (defendant).

*Opinion*

GRUENDEL, J. The self-represented plaintiff, Leszek M. Schoenborn, appeals from the judgment of dissolution rendered by the trial court. He claims that the court (1) abused its discretion in allocating parenting time

between the parties, (2) improperly determined that the parties' antenuptial agreement was not unconscionable, (3) failed to consider the earning capacity of the defendant, Malgorzata Schoenborn, in rendering its child support order, and (4) erroneously calculated the plaintiff's earning capacity. We affirm the judgment of the trial court.

The court's comprehensive memorandum of decision contains the following relevant facts. The parties married in Waterbury on September 19, 2000, and three children were born of the marriage. Following the subsequent breakdown of the marriage, the plaintiff commenced a dissolution action in 2010. In response, the defendant filed an answer and a cross complaint. A three day trial followed in February, 2012. On March 2, 2012, the court rendered judgment dissolving the parties' marriage, finding that it had broken down irretrievably.

As part of the judgment of dissolution, the court made numerous factual findings and fashioned various orders. The court found, inter alia, that "[o]n September 18, 2000, the parties signed the antenuptial agreement. The plaintiff was represented by counsel and the defendant had the opportunity to review the agreement with independent counsel but knowingly waived that right. The parties were fully aware of the rights which they both chose to waive and there was fair and reasonable financial disclosure between them. The antenuptial agreement is not found to be unconscionable as of the time of the marriage or the time of dissolution. The antenuptial agreement is valid and enforceable, incorporated herein by reference thereto and included within the judgment of this court." With respect to child support, the court found "[b]ased on the parties' net income and the child support and arrearage guidelines regulations, the court finds the presumptive amount of child

support payable by the plaintiff husband to the defendant wife is $335 a week."

After ordering joint legal custody of the minor children with primary physical custody vested in the defendant, the court adopted, as an order of the court, "the parenting plan set forth in the guardian ad litem's proposed orders dated February 16, 2012." That plan provides in relevant part: "The [plaintiff] shall have parenting time with his son on Monday from after school through 8:00 p.m. and with his daughters on Wednesday from after school through 8:00 p.m. The [plaintiff] shall have parenting time with all three children every other weekend from Saturday at 9:00 a.m. through Sunday at 6:00 p.m. Ingrid will return to [the defendant] on Saturdays at 6:00 p.m., Isabelle and Albert shall spend the night through Sunday at 6:00 p.m." From that judgment, the plaintiff appeals.[1]

## I

The plaintiff first claims that the court abused its discretion in allocating parenting time between the parties. "Our standard of review of a trial court's decision regarding custody, visitation and relocation orders is one of abuse of discretion. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . Further, [t]he trial court has the opportunity to view the parties first hand and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant." (Internal quotation marks omitted.) *McKechnie* v. *McKechnie*, 130 Conn. App. 411, 421, 23 A.3d 779, cert. denied, 302 Conn. 931, 28 A.3d 345 (2011).

[1] Pursuant to Practice Book § 67-13, the guardian ad litem for the minor children filed a statement adopting the brief of the defendant in this appeal.

In fashioning its visitation order, the court adopted the parenting plan proposed by Attorney Otto H. Iglesias, the guardian ad litem for the minor children. In so doing, the court evaluated not only the testimony of the parties, but also that of family relations officer Jaime Ment, and Stephen Humphrey, a psychologist who individually evaluated the parties and also conducted an interactional evaluation of the parties with the minor children.[2] Iglesias, Ment and Humphrey all recommended limiting the plaintiff to alternating weekend visitation with the children. As the court noted, "[t]he plaintiff believes the singular recommendations of the three professionals to be the result of collusion. He cannot accept that he bears any responsibility for the recommendations being as they are. He should. The court does not find any collusion between the professionals and finds each performed their evaluations independently and thoughtfully."

The court particularly credited the testimony and proposed visitation order of Iglesias. The court emphasized that "the involvement of the [guardian ad litem] continued after [Ment] and Humphrey completed their evaluations, and he was privy to the changing relationship between the daughters of the couple and the plaintiff . . . ." The court found that "the [plaintiff's] parenting time was changed in the fall of 2011, by agreement of the parties . . . . The [plaintiff] had been spanking the [daughters], they were upset by being spanked, and they did not want to stay with him overnight. [The plaintiff] was not spanking [his son]. The [plaintiff] said that [his son] never lied or did anything bad to the girls, but the girls were being bullies to [the son]. The defendant . . . is concerned that the [plaintiff's] disparate treatment of the children will affect

---

[2] Ment and Humphrey completed written reports in the spring of 2011, which were admitted into evidence as exhibits at trial.

their sibling relationship." Those findings are supported by the record and, hence, are not clearly erroneous.

"[I]t is well established that the evaluation of a witness' testimony and credibility are wholly within the province of the trier of fact." *Szczerkowski* v. *Karmelowicz*, 60 Conn. App. 429, 434, 759 A.2d 1050 (2000). "Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Blum* v. *Blum*, 109 Conn. App. 316, 329, 951 A.2d 587, cert. denied, 289 Conn. 929, 958 A.2d 157 (2008). We conclude that the court was well within its discretion to credit the testimony of the guardian ad litem and to adopt his proposed visitation order.

II

The plaintiff contends that the court improperly concluded that the parties' antenuptial agreement was not unconscionable. We disagree.

The following additional facts, as found by the court, are relevant to this claim. The parties met in the spring of 1999. The defendant recently had graduated from dental school and was in a residency program at St. Mary's Hospital in Waterbury. The plaintiff was in the business of acquiring, renovating and supervising rental properties. At that time, the plaintiff had assets exceeding $1.5 million in value, whereas the defendant had $1000 in assets.

At the behest of the plaintiff, the parties entered into an antenuptial agreement prepared by the plaintiff's

attorney. The agreement provides in relevant part: "Whereas, each desires to keep all of his or her separate property whether now owned or hereafter acquired free from any claim of the other by virtue of the forthcoming marriage unless otherwise provided . . . . [The plaintiff] and [the defendant] hereto agree: (1) In any proceeding in which either party seeks a legal separation or a dissolution of the intended marriage under the law of the State of Connecticut or other jurisdiction in which one or both of the parties may be domiciled, [they] agree that in any such action neither will ask for any different or greater rights of relief than specified herein and that they will abide with and be bound by the provisions of this agreement now and hereafter. . . . (3) Neither [the plaintiff] or [the defendant] shall acquire by the intended marriage any right or title to or interest in any property owned by the other before such marriage; nor shall either [the plaintiff] or [the defendant] acquire after such marriage any right or title to or interest in the appreciation in the value of such property or in the proceeds from the sale of such property or in assets purchased by either [the plaintiff] or [the defendant] during said marriage with the proceeds from the sale of property owned by either party before the marriage or acquired after the marriage or with other funds . . . . (4) In the event that either [the plaintiff] or [the defendant] institutes a proceeding for legal separation or dissolution of the marriage . . . each party . . . agrees not to seek or accept and specifically waives any right to an alimony (maintenance) award, period or lump sum, temporary and/or permanent, or to a property settlement distribution against the other except as it pertains to property held in joint names with rights of survivorship. . . . (7) [E]ach party shall keep and retain sole ownership, control and enjoyment of all property, real and personal, the unrealized appreciation and proceeds thereof, accumulations and

accretions added thereto, now owned or hereafter acquired and howsoever acquired by him or her, free and clear of any claim of the other during marriage or upon termination of the marriage by death or otherwise." The parties signed that agreement on September 18, 2000, and married a day later.

The defendant concluded her dental residency in July, 2001, and thereafter held various positions as a dentist. In September, 2003, she bought a dental practice in West Hartford. As the court found, "[t]he dentist from whom she acquired the practice was Russian speaking and his clients were primarily Russian speaking. The defendant speaks Russian and Polish and was therefore uniquely qualified to acquire and build the practice—which she has done. She expanded to two offices, the other being located in Plainville. She is clearly a driven and motivated person." At the time of dissolution, the defendant had "amassed assets having a value of approximately $1.5 million since the marriage; many of the assets are related to the operation of her dental practice." The court further found that the plaintiff's assets had increased from $1.5 million to approximately $2 million, noting that "[h]e owns more properties as of the time of the divorce than he did at the time of the marriage . . . ."

The plaintiff now claims that the antenuptial agreement prepared by his attorney and entered into by the defendant at his behest "should be held unenforceable because it was unconscionable at the time of enforcement. . . . [T]he enormity of the defendant's success was certainly not within the contemplation of the parties at the time the agreement was entered into . . . and enforcement of the agreement would work an injustice." The trial court was not persuaded by that argument, and neither are we.

As our Supreme Court has explained, "[a]n antenuptial agreement is a type of contract and must, therefore,

comply with ordinary principles of contract law. . . .
[A]ntenuptial agreements are to be construed according
to the principles of construction applicable to contracts
generally." (Internal quotation marks omitted.) *Crews*
v. *Crews*, 295 Conn. 153, 159, 989 A.2d 1060 (2010).
"[A]ntenuptial agreements relating to the property of
the parties, and more specifically, to the rights of the
parties to that property upon the dissolution of the
marriage, are generally enforceable . . . [if] the cir-
cumstances of the parties at the time the marriage is
dissolved *are not so beyond the contemplation* of the
parties at the time the contract was entered into as to
cause its enforcement to work injustice." (Emphasis in
original; internal quotation marks omitted.) Id., 167–68.

"[T]he party seeking to challenge the enforceability
of the antenuptial contract bears a heavy burden. . . .
This heavy burden comports with the well settled gen-
eral principle that [c]ourts of law must allow parties to
make their own contracts. . . . It is established well
beyond the need for citation that parties are free to
contract for whatever terms on which they may agree.
. . . Whether provident or improvident, an agreement
moved on calculated considerations is entitled to the
sanction of the law . . . ." (Citations omitted; internal
quotation marks omitted.) Id., 169. Accordingly, to "ren-
der unenforceable an otherwise valid antenuptial
agreement, a court must determine: (1) the parties'
intent and circumstances when they signed the antenup-
tial agreement; (2) the circumstances of the parties at
the time of the dissolution of the marriage; (3) whether
those circumstances are 'so far beyond' the contempla-
tion of the parties at the time of execution; and (4) if
the circumstances are beyond the parties' initial con-
templation, whether enforcement would cause an injus-
tice." Id., 168; see also General Statutes § 46b-36g. That
inquiry is conducted pursuant to the plenary standard
of review. Id., 167.

The record before us substantiates the court's conclusion that the parties' agreement was not unconscionable. As the court specifically found, "the agreement was executed by both parties knowingly and voluntarily and . . . was taken quite seriously by the [defendant]. After the execution of the agreement, the parties abided by its terms. The parties kept all of their assets and their debts separate . . . . They went so far as to execute promissory notes when money was loaned between them." Those findings are supported by the evidence in the record.

As previously noted, the court found that, at the time the agreement was executed, the plaintiff had $1.5 million in assets compared to the defendant's $1000 in assets. At the time of dissolution, the plaintiff's assets had grown to approximately $2 million; the defendant had assets totaling $1.5 million. In its memorandum of decision, the court concluded that "[d]espite the change in net worth of the [defendant], the court does not find the enforcement of the antenuptial agreement to be unconscionable . . . . The [plaintiff] at the time of the marriage knew his fiancée was completing her dental residency and she was a dentist at the time of the marriage. The increase in her income and a resultant increase in her net worth were certainly foreseeable."

We concur with that assessment. At the time the parties married, the defendant was beginning her career as a dentist. The subsequent increase in her net worth was contemplated by the plain terms of the agreement, hence the inclusion of language providing that "*each party* shall keep and retain sole ownership, control and enjoyment *of all property*, real and personal, the unrealized appreciation and proceeds thereof, *accumulations and accretions added thereto, now owned or hereafter acquired and howsoever acquired by him or her*, free and clear of any claim of the other during marriage or upon termination of the marriage by death

or otherwise." (Emphasis added.) Furthermore, it is not insignificant that the plaintiff increased his own net worth by one-half million dollars over that time, a point emphasized by the court in rejecting the plaintiff's claim.

As a result, the "circumstances of the parties at the time of the dissolution of the marriage"; *Crews* v. *Crews*, supra, 295 Conn. 168; were not so far beyond the contemplation of the parties as to render the agreement unconscionable. Accordingly, the plaintiff's claim fails.

### III

The plaintiff also argues that the court failed to consider the defendant's earning capacity in rendering its child support order.[3] "In fashioning its financial orders, the court has broad discretion, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . That standard of review reflects the sound policy

[3] In addition, the plaintiff claims that the court erroneously calculated the defendant's gross weekly income. We disagree. The court expressly found the defendant's financial affidavit credible, which set forth a gross weekly income of $4867. Although the defendant testified that she collected approximately $500 per week in rental income, she testified that she did not include that amount in the rent section of her financial affidavit because she also paid rent that was not included on the affidavit, and that she has various rental expenses that likewise were not included. She explained that her rental receipts were handled by an accountant who calculated both rental income and expenses. When the income exceeded expenses, the accountant placed the surplus in a business checking account. The defendant testified that any such rental income was reflected on her financial affidavit under that bank account. The plaintiff, who appeared pro se throughout the proceedings and cross-examined the defendant, never inquired further as to the specific amount of rental income surplus typically received, if any. On the record before us, we thus cannot conclude that the court's finding was clearly erroneous.

that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Internal quotation marks omitted.) *Sander* v. *Sander*, 96 Conn. App. 102, 105, 899 A.2d 670 (2006). We likewise note that "[a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding on this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Buehler* v. *Buehler*, 117 Conn. App. 304, 317–18, 978 A.2d 1141 (2009).

The plaintiff claims that the court considered the defendant's stated income exclusively and failed to consider her earning capacity, in contravention of General Statutes § 46b-84 (d). That statute requires the court, in crafting a child support order, to "consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." General Statutes § 46b-84 (d). His claim is belied by the memorandum of decision before us, in which the court acknowledged that the earning capacity of the parties was a relevant consideration. The court prefaced its financial orders by noting that it "may under appropriate circumstances . . . base financial awards on the earning capacity of the parties rather than on actual

earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Internal quotation marks omitted.)

In articulating specific orders at the conclusion of its memorandum of decision, the court stated with respect to the issue of child support: "Based on the earning capacity of the plaintiff . . . the court finds his gross weekly income to be $4000, and his net weekly income to be $2624. The [defendant's] gross weekly income is $4867, and her net is $2753. Based on the parties' net income and the child support and arrearage guideline regulations, the court finds that the presumptive amount of child support payable by the plaintiff . . . to the defendant . . . is $335 a week. After hearing the testimony of the parties and reviewing the financial affidavits, the earnings of the respective parties and the deviation criteria set forth in . . . the child support and arrearage guidelines regulations, the court orders the [plaintiff] to pay the sum of $335 a week for child support."[4] As this court has recognized, although a court is obligated under Connecticut law to consider earning capacity, "the decision whether to deviate from the guidelines on the basis of that criterion is left to the court's sound discretion." *Gilbert* v. *Gilbert*, 73 Conn. App. 473, 483, 808 A.2d 688 (2002). We further emphasized that a trial court's decision not to deviate from the guidelines does not, a fortiori, "demonstrate a failure to consider that criterion." Id.

In the present case, the court heard detailed testimony from the parties and reviewed their respective financial affidavits. The court expressly considered the

[4] Among the criteria for deviation set forth in § 46b-215a-3 of the Regulations of Connecticut State Agencies is the parent's earning capacity.

deviation criteria set forth in the child support and arrearage guideline regulations. On the record before us, we therefore cannot conclude that the court failed to consider the defendant's earning capacity in rendering its child support order.

IV

The plaintiff lastly claims that the court erroneously calculated his own earning capacity in rendering its child support order. Distilled to its essence, his claim is that the court improperly declined to credit his testimony and documentary evidence.

As earlier noted, this court cannot pass on issues of credibility and must defer to the trier of fact's assessment thereof. *Blum* v. *Blum*, supra, 109 Conn. App. 329. The court, as trier of fact in the present case, deemed the plaintiff's evidence and testimony lacking in credibility. Specifically, the court found: "The [plaintiff's] compliance with mandatory disclosure required under Practice Book § 25-32[5] has been abysmal. At the start of

---

[5] Practice Book § 25-32, titled "Mandatory Disclosure and Production," provides: "(a) Unless otherwise ordered by the judicial authority for good cause shown, upon request by a party involved in an action for dissolution of marriage or civil union, legal separation, annulment or support, or a postjudgment motion for modification of alimony or support, opposing parties shall exchange the following documents within thirty days of such request:

"(1) all federal and state income tax returns filed within the last three years, including personal returns and returns filed on behalf of any partnership or closely-held corporation of which a party is a partner or shareholder;

"(2) IRS forms W-2, 1099 and K-1 within the last three years including those for the past year if the income tax returns for that year have not been prepared;

"(3) copies of all pay stubs or other evidence of income for the current year and the last pay stub from the past year;

"(4) statements for all accounts maintained with any financial institution, including banks, brokers and financial managers, for the past 24 months;

"(5) the most recent statement showing any interest in any Keogh, IRA, profit sharing plan, deferred compensation plan, pension plan, or retirement account;

"(6) the most recent statement regarding any insurance on the life of any party;

trial, he was ordered by the court to produce an updated financial affidavit, and he prepared one that day. The February 2, 2012 affidavit reflects a weekly gross income of $2000 and a weekly withholding tax of $1000. Despite signing an oath as to its accuracy, he subsequently acknowledged that the deductions to his gross income as shown on the affidavit are inaccurate inasmuch as he used his financial affidavit filed in June, 2010, to approximate his deductions and that affidavit reflected such deductions on the basis of an income of over $5000 a week. . . . He also owns a piece of property in Vermont . . . [but] did not list the Vermont property on his financial affidavit. . . . [T]he [plaintiff] was court ordered to file his tax returns and to produce the same to the [defendant]. He has not, as of the close of evidence, filed any tax returns since 2002—he testified that he is too busy. The court finds the income, deductions and expenses shown on his February 2, 2012 financial affidavit to be totally unreliable." The court further found that "the [plaintiff] owns, directly or indirectly, forty-three rental units" in Newington, Wethersfield and Hartford. Because "[t]here are no mortgages" on any of those properties, the court found that the plaintiff "has been able to generate large quantities of cash from his business ventures."[6]

"(7) a summary furnished by the employer of the party's medical insurance policy, coverage, cost of coverage, spousal benefits, and COBRA costs following dissolution;

"(8) any written appraisal concerning any asset owned by either party.

"(b) Such duty to disclose shall continue during the pendency of the action should a party appear. This section shall not preclude discovery under any other provisions of these rules."

[6] On the issue of large quantities of cash, the court in its memorandum of decision found that the plaintiff "acknowledged having a bag of money in his possession in 2010, but he believes [that] the [defendant] took it from his car at the time he was appearing in court in New Britain on criminal charges." The court noted that "[w]hile not in evidence, as the information was presented in the form of a question [the plaintiff] posed to the [defendant] during his cross-examination of her, the [plaintiff] asked if she had found '$146,000 in cash in old folded hundreds' in a bag. He also made reference to the bag of money at other times during his questioning and his

With respect to monthly rental earnings, the court credited the plaintiff's testimony "that most of his tenants pay their rent in cash and that the average rental is $600 per unit." The court then stated: "He claimed most of the units are empty, but he also testified, inconsistently, that thirty [units] are rented. If thirty units are rented, then the rent generated therefrom would be approximately $18,000 a month. Even if one can assume the . . . rental income approximates his actual rental income, as it is impossible to differentiate his personal from his business expenses, no approximation of his net income can be accurately determined." On the evidence before it, the court, "[b]ased on lifestyle, the accumulation of properties and the other findings of the court," found that the plaintiff had "an earning capacity of $4000 a week, gross, and a net of $2624 a week and will base financial orders thereon."[7] Mindful of the deferential standard of review that governs such claims, we cannot say that the court's findings with respect to the plaintiff's earning capacity were clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

own testimony, but without specifics as to the amount." At oral argument before this court, the plaintiff repeated his allegation that the defendant had stolen his bag of cash containing $146,000.

[7] Consistent with our Supreme Court's recent pronouncement in *Tanzman* v. *Meurer*, 309 Conn. 105, 70 A.3d 13 (2013), the court determined the specific dollar amount of the plaintiff's earning capacity.