******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARY MCTIERNAN *v.* BARRY MCTIERNAN
(AC 37309)

DiPentima, C. J., and Gruendel and Mullins, Js.*

*Argued January 20—officially released April 14, 2016***

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Tierney, J. [dissolution judgment];
S. Richards, J. [motion for contempt].)

*Francis L. O'Reilly*, with whom was *Jane Ford Shaw*,
for the appellant (defendant).

*George J. Markley*, for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. The defendant, Barry McTiernan, appeals from the July 23, 2014 judgment of the trial court granting, in part, the postjudgment motion for contempt filed by the plaintiff, Mary McTiernan, regarding the defendant's alleged noncompliance with an unallocated alimony and child support order. The defendant also appeals from the court's December 9, 2014 judgment, in which the court awarded the plaintiff $44,285.93 in attorney's fees and $14,805.25 in expert witness fees in connection with that motion for contempt. His principal claim is that the court, in concluding that he had not complied with the unallocated alimony and child support order, improperly interpreted "gross annual earned income," as that terminology is used in the separation agreement between the parties, to include distributions from a limited partnership interest. In addition, the defendant challenges the propriety of the award of attorney's fees and expert fees to the plaintiff.[1] We reverse the judgment of the trial court.

Our factual recitation is hampered by the fact that the trial court did not furnish a detailed memorandum of decision in this case, but rather awarded the plaintiff the sum of $370,440, plus attorney's fees and expert fees, in a one paragraph JDNO notice,[2] and thereafter declined to articulate the substance of that judgment at the behest of the defendant. The following facts and procedural history are culled from the record and largely are undisputed.[3] The parties married in 1989, and five children were born of the marriage. Following the subsequent breakdown of their marriage, the parties voluntarily entered into a comprehensive separation agreement dated October 23, 2003, that the court incorporated into its judgment of dissolution. On February 9, 2004, the court dissolved the marriage, finding that it had broken down irretrievably without attributing fault to either party as to the cause.

Pertinent to this appeal are the following provisions of the separation agreement. Paragraph 4.2 provides in relevant part that "[c]ommencing on January 1, 2004, the [defendant] shall pay to the [plaintiff] as unallocated alimony and child support a sum equal to forty-five (45%) percent of his Gross Annual Earned Income up to a maximum of $1,750,000, until the death of either party, the remarriage of the [plaintiff], or December 31, 2013, whichever occurs first." Paragraph 4.3 provides: " 'Gross Annual Earned Income,' as used in this Agreement, shall mean all cash compensation for personal services from current or future employment including, but not limited to, wages, salary, bonuses, commissions, consulting, directors and other fees, disability payments, partnership distributions and other remuneration received by the [defendant] from employment or which the [defendant] shall be entitled to receive from employment, but has elected to defer or

decline, including payments made by the [defendant] to [his] IRA, pension, profit sharing or like retirement plans and payments (but not including payments made by the [defendant] from income on which the [plaintiff] has already received her percentage share). It is the intention of the parties that the [defendant] shall take no action, the specific intention of which is to reduce or divert income or increase business expenses or deductions for the purpose of defeating or reducing his alimony and support obligations to the [plaintiff]. In the event the [defendant] changes the nature of his employment, the definition of 'gross annual income' shall be modified accordingly to reflect the [defendant's] new income, which may include, for example payment in stock, income from one or more businesses, rental income, royalties and partnership distributions." Paragraph 5.8 of the agreement provides in relevant part that "[t]he [defendant] shall retain the following assets and the [plaintiff] shall make no claim to them . . . 3. Cantor Fitzgerald, LP Capital Account and Grant Units worth approximately $325,000 . . . ." Lastly, paragraph 5.10 provides in relevant part that "[t]he following assets shall be divided equally between the parties . . . 6. Cantor Fitzgerald, LP Profit Sharing."

On April 18, 2013, the plaintiff filed a postjudgment motion for contempt against the defendant. In that motion, she alleged in relevant part that "[t]he defendant has been continuously employed since the date of dissolution at Cantor Fitzgerald as a financial advisor and trader," that he "has failed and/or refused to pay the plaintiff forty-five (45%) percent of the income he has earned over the last six years," and that he "has not complied with the orders of the court." She thus requested that the court find the defendant in contempt and order him to (1) immediately pay her "the unallocated child support and alimony owed for the past six years," (2) pay "all of the fees and costs associated with the filing of this motion," and (3) "be incarcerated." The defendant thereafter filed an objection to that motion,[4] as well as various motions unrelated to this appeal.

A three day hearing on the plaintiff's motion for contempt began on March 25, 2014. The first witness to testify was the plaintiff. In her testimony, the plaintiff acknowledged that the defendant had provided her with earning statements at the end of each year, which she utilized in preparing her tax returns. She also testified that she received monthly payments from the defendant for unallocated alimony and child support. The plaintiff testified that she did not "know anything . . . financially about . . . the workings of how [the defendant's] income" was computed, and for that reason hired a forensic accountant. After consulting with that accountant, the plaintiff came to "believe that there is income . . . that I am owed through distributions that I have

not received according to our divorce agreement." In short, she was advised that the distributions the defendant received from the "Capital Account and Grant Units" (capital account) of "Cantor Fitzgerald, LP" (limited partnership),[5] qualified as gross annual earned income under the separation agreement. When asked specifically what she was claiming with respect to the partnership distributions, the plaintiff answered, "whatever the forensic accountant testifies to." The plaintiff later was asked to specify the basis for her claim that the defendant had not paid her 45 percent of his gross annual earned income. She testified that the basis for her claim "[i]s because once the documents were given to the forensic accountant, he—from what I understand, 45 percent of [the defendant's] income has not been paid to me."

The second witness to testify was the defendant. He testified that he was employed by Cantor Fitzgerald Securities, as identified on his W-2 form that was admitted into evidence,[6] and that he was not an employee of the limited partnership.[7] Although the defendant testified that his employer, Cantor Fitzgerald Securities, and the limited partnership were distinct entities, he nevertheless acknowledged that the limited partnership held an ownership interest in Cantor Fitzgerald Securities. The defendant noted that the limited partnership also owned "about fifteen different larger companies" including, inter alia, a diamond exchange, three "casino/gaming licenses," and three companies in China, as well as an 11 percent stake in a commercial real estate venture.

The defendant testified that he does not receive either a paycheck or a W-2 form from the limited partnership, and that the distributions from the limited partnership were "not from any personal use of my services or anything like that. . . . [The plaintiff] and I purchased the asset. We purchased the asset together. . . . At the divorce, she wanted none of it. She took the Florida [property][8] and the cash. She wanted none of it. It was an asset. It's a limited partnership asset."[9] (Footnotes added.) The defendant also testified that he and the plaintiff "signed a loan to buy" their interest in the limited partnership. He thereafter received disbursements from the capital account of the limited partnership, which are reflected on the schedule K-1 forms that he filed annually with the Internal Revenue Service.[10] In his testimony, the defendant acknowledged that those disbursements constituted partnership distributions.[11]

With respect to the correlation between those distributions and his employment at Cantor Fitzgerald Securities, the defendant explained, "I never got any K-1 income until I bought [the limited partnership interest]. It's not my personal use, my personal services . . . . I bought this thing and it pays the same percentage each year. . . . [E]very year, no matter what the lim-

ited partnership does, it pays me on how they did from like fifty different businesses. And it has nothing to do with my personal services." Asked directly whether he performed personal services for the limited partnership, the defendant answered, "no." As he put it, "I don't work for them. I don't do anything for them." At the same time, paragraph 5.13 of the separation agreement expressly provides that the defendant "is entitled to reimbursement from [the limited partnership] for business expenses incurred . . . and he shall pay to the [plaintiff] one-half (1/2) of such reimbursement expenses as received." Although the defendant was not asked specifically about that provision during the contempt hearing, he did confirm in his testimony that "Cantor Fitzgerald" reimbursed him for business expenses on a regular basis.[12]

The defendant's 2012 schedule K-1 (K-1 form) indicates that the defendant owned a five-hundredths of 1 percent interest in the limited partnership. The defendant testified that participation in the limited partnership is not restricted to employees of Cantor Fitzgerald Securities, noting that "[t]here are guys who retire, there are guys who work at other places who still own [an interest in the limited partnership]. There are people outside who have never worked at [Cantor Fitzgerald Securities] who have [purchased an interest in] the limited partnership. There [are] charities that have [an interest in] the limited partnership. . . . There [are] a ton of people who don't work for Cantor Fitzgerald [Securities] . . . who bought into this limited partnership. They are wealthy individuals . . . . It's not contingent on my job." It is undisputed that the defendant was a limited partner in the limited partnership, as reflected by the K-1 form admitted into evidence and the testimony of both the defendant and the plaintiff's expert.

Regarding his obligation under paragraph 4.2 of the separation agreement, the defendant presented testimonial and documentary evidence indicating that he had complied with the unallocated alimony and child support order with respect to his gross annual income, as documented on his W-2 forms provided by Cantor Fitzgerald Securities. That compliance is not contested in this appeal. Rather, this appeal pertains solely to the distributions the defendant received from the capital account of the limited partnership.

On the third day of the hearing, the plaintiff offered the expert testimony of Joseph DeCusati, a certified public accountant and forensic accountant. DeCusati was retained by the plaintiff "to perform various valuation and forensic accounting services." Also admitted into evidence was DeCusati's March 25, 2014 report. That report contained "[a]n analysis of the personal income tax returns and other financial documents relating to [the defendant] for 2004 through 2012," which

detailed the precise amount of distributions received by the defendant from the capital account of the limited partnership, as reflected on his K-1 forms.[13] DeCusati's report included those distributions in his analysis of the defendant's gross annual earned income.

At the contempt hearing, DeCusati testified that, in preparing his report, he requested copies of the defendant's K-1 forms after noticing that paragraph 4.3 of the separation agreement "specifically states that partnership distributions and other remunerations received by the [defendant] is to be considered in the calculation" of gross annual earned income.[14] DeCusati then offered a comparison of the amount of alimony and child support reported on the defendant's tax returns with what his analysis concluded should have been paid, noting the shortfall for each year. DeCusati testified that, because the defendant had not included his distributions from the capital account of the limited partnership in his gross annual earned income when making his unallocated alimony and child support payments, he had underpaid the plaintiff by the sum of $370,441 over the years in question.

DeCusati offered conflicting testimony as to whether the distributions reflected on the K-1 forms were connected to the defendant's employment. DeCusati testified that the defendant's interest in the capital account of the limited partnership was an "asset" and repeatedly characterized the distributions therefrom as "a return on his investment." On cross-examination, DeCusati testified unequivocally that those distributions were not from employment with the limited partnership.[15] On redirect examination, DeCusati testified otherwise. He emphasized that the limited partnership and Cantor Fitzgerald Securities are affiliated entities and that, in the deposition testimony that he had reviewed, the defendant "testified that he would no longer be able to receive distributions if he were to separate from service with his employer." DeCusati also noted that the defendant, for a period of ten years, consistently reported the distributions from the capital account of the limited partnership as nonpassive income on his personal tax returns. By so doing, DeCusati testified that the defendant was "making the representation with his signed tax return that the income that he's generating . . . from this limited partnership investment is something he's actively participating in producing."[16] In light of the foregoing, DeCusati stated that the defendant's ownership interest in the limited partnership was connected to his employment at Cantor Fitzgerald Securities.

The final witness to testify at the hearing was the defendant's expert, Samuel L. Braunstein, an attorney with an LLM degree in taxation and approximately thirty-five years of experience as a certified public accountant. Braunstein testified that he had prepared or reviewed "thousands" of tax returns on behalf of

limited partnerships over the years. In preparing for his testimony, Braunstein reviewed the income tax returns and K-1 forms at issue. Like the defendant, Braunstein acknowledged that the disbursements reflected on the defendant's K-1 forms constituted partnership distributions. When asked where those distributions would be reported on his income tax return, Braunstein answered that "[i]t would not be reported on his income tax return . . . because it has nothing to do with income tax. It's a distribution of money . . . from the limited partnership to him in his capacity as a limited partner." When the plaintiff's counsel inquired as to the distinction between passive and nonpassive reporting of distributions reflected on a K-1 form, Braunstein explained that "the partnership determines whether it's active or passive in flowing through to the partners. The partners have to reflect on their individual tax returns how [it is] reported [by the partnership]. If it's [reported as] active then it's not going to be subject to passive lost limitations. . . . If it's passive it is going to be subject to passive activity losses. Now, if a [partnership] has real estate investments, for example . . . and there's a big loss . . . the accountant has to make a determination: is it better to be reported passive or active. Because active sometimes doesn't offset passive, passive profits will offset passive losses. It's a game."[17] Asked to explain the difference between such income being categorized as passive versus active, Braunstein testified that "[f]or a limited partner in a large limited partnership there is no difference except when it hits the individual partner's tax return and you have to look and see what effects it will have on other types of income. That's it."

Braunstein also was asked where, if the defendant had earned income from the limited partnership, such earned income would be designated on the K-1 form. Braunstein replied that "[i]t would be in one of two places. It would be under [line] four, guaranteed payments, or it would be reflected in [line] fourteen, self-employment earnings or losses." Braunstein testified, and the K-1 form in evidence confirms, that no such earnings are included on the defendant's K-1 form. On that basis, Braunstein opined that "[t]here were no earnings attributed to [the defendant] from work performed for the partnership." Accordingly, Braunstein testified that, in his opinion, the partnership distributions included on the K-1 form from the capital account of the limited partnership did not qualify as gross annual earned income, as it is defined in paragraph 4.3 of the separation agreement. Like DeCusati, Braunstein offered no documentary or testimonial evidence regarding the intent of the parties in crafting the provisions of the separation agreement at issue.

The court decided the plaintiff's motion for contempt approximately four months later. By JDNO notice dated July 23, 2014, the court ruled as follows: "The court grants in part and denies in part the plaintiff's motion

for contempt re: unallocated child support and alimony, postjudgment, only as follows: The court finds that the plaintiff's evidence of underreporting by the defendant of his 'gross annual earned income' including that of the testimony of her witness who prepared a forensic audit of the defendant's gross annual earned income. Although the defendant argues that limited partnership distributions he received are expressly excluded under [the] definition of 'gross annual earned income' as set forth in [paragraph 4.3] of the separation agreement and [were] distributed to him to the exclusion of the plaintiff under [paragraph 5.8] of the separation agreement, the court is not persuaded. Following its review of both articles and the entire separation agreement, the court observed that the term 'partnership distributions,' which is included in the definition of 'gross annual earned income,' is repeated twice in [paragraph] 4.3. The court interprets this language to mean that said distributions shall be treated as part of the defendant's gross annual earned income for purposes of calculating the plaintiff's unallocated alimony order. The court concludes that the defendant underpaid his unallocated support order by $370,440. Based on the foregoing, the court hereby orders the defendant to pay the plaintiff $370,440 within forty-five calendar days from the date of this ruling. However, the court denies the plaintiff's request to hold the defendant in wilful contempt and incarcerate him for said underpayment as the court finds that the plaintiff failed to prove that the defendant's failure to comply with the court order was wilful. Further, the court grants the plaintiff's request for attorney's and expert fees related to the prosecution of this motion pending a hearing on said fees."[18]

In response, the defendant filed motions for articulation and reargument on August 7, 2014. His motion for articulation asked the court to articulate the basis of its determination that the distributions he received from the limited partnership qualified as gross annual earned income under the separation agreement. In his motion for reargument, the defendant submitted that the court's determination violated the terms of the separation agreement, as distributions from the limited partnership were "expressly excluded under the definition of 'gross annual earned income' as set forth in [paragraph 4.3] and were distributed to him to the exclusion of the plaintiff pursuant to [paragraph] 5.8 of the separation agreement." The defendant further argued that the distributions at issue were not "income that was derived from 'compensation for personal services from current employment,' " as required by paragraph 4.3 of the separation agreement, but rather was "an asset which was purchased by the defendant while married to the plaintiff . . . ." The court summarily denied those motions on October 8, 2014. At a hearing held on December 9, 2014, the court awarded the plaintiff $44,285.93 in

attorney's fees and $14,805.25 in expert fees. This appeal followed.[19]

## I

The defendant's principal claim in this appeal is that the court improperly interpreted "gross annual earned income," as that terminology is defined in paragraph 4.3 of the separation agreement, to include distributions from the capital account of the limited partnership. "It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts." (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 191, 112 A.3d 144 (2015). Our analysis begins, therefore, with an overview of those general principles.

"When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) Id., 191–92.

The record reveals that the court in the present case determined that the contractual language at issue unam-

biguously provided that the distributions from the capital account of the limited partnership constituted part of the defendant's gross annual earned income. In its July 23, 2014 notice of decision, the court stated in relevant part that "[a]lthough the defendant argues that limited partnership distributions he received are expressly excluded under [the] definition of 'gross annual earned income' as set forth in [paragraph 4.3] of the separation agreement and was distributed to him to the exclusion of the plaintiff under [paragraph 5.8] of the separation agreement, the court is not persuaded. Following its review of both [paragraphs] and the entire separation agreement, the court observed that the term 'partnership distributions,' which is included in the definition of 'gross annual earned income,' is repeated twice in [paragraph] 4.3. The court interprets this language to mean that said distributions shall be treated as part of the defendant's gross annual earned income for purposes of calculating the plaintiff's unallocated alimony order."[20] Significantly, the court did not articulate *any* factual findings with respect to the intent of the parties in enacting the contractual language at issue. Had the court found paragraph 4.3 to be ambiguous, it necessarily would have made factual findings as to the intent of the parties. See *Fazio* v. *Fazio*, 162 Conn. App. 236, 250, 131 A.3d 1162 (ambiguity in separation agreement "required" trial court "to make a finding of fact as to the parties' intent"), cert. denied, 320 Conn. 922, A.3d (2016); see also *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 106, 84 A.3d 828 (2014) (because contract at issue was ambiguous "the trial court was required to resolve this ambiguity by considering the extrinsic evidence and making factual findings as to the parties' intent"). No such findings are reflected in the record before us.[21]

In addition, when the defendant, toward the end of the three day contempt hearing, sought to admit into evidence certain federal tax regulations that provided a "definition of earned income under the Internal Revenue Code," the court admonished the defendant as follows: "Well the basic principle . . . going back to the laws of the construction of contracts . . . the general premise is that if an agreement is clear and unambiguous on its face, extrinsic documents are not permitted."[22] Furthermore, the court's January 8, 2016 "clarification and rectification," like its July 23, 2014 notice of decision, does not contain any factual findings with respect to the intent of the parties in enacting the contractual language at issue. In light of the foregoing, the court's decision in the present case can only be construed as a determination that paragraph 4.3 of the separation agreement is unambiguous.[23]

Accordingly, to resolve the claim presented in this appeal, we first must ascertain whether the court properly determined that paragraph 4.3 of the separation agreement unambiguously provides that distributions

from the capital account of the limited partnership constitute gross annual earned income thereunder. That issue presents a question of law over which our review is plenary. *Remillard* v. *Remillard*, 297 Conn. 345, 355, 999 A.2d 713 (2010). "Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . In contrast, an agreement is ambiguous when its language is reasonably susceptible of more than one interpretation." (Citation omitted; internal quotation marks omitted.) Id.

The separation agreement in the present case provides that "[c]ommencing on January 1, 2004, the [defendant] shall pay to the [plaintiff] as unallocated alimony and child support a sum equal to forty-five (45%) percent of his Gross Annual Earned Income up to a maximum of $1,750,000, until the death of either party, the remarriage of the [plaintiff], or December 31, 2013, whichever occurs first." Paragraph 4.3 of that agreement, in turn, furnishes a definition of gross annual earned income. It provides: " 'Gross Annual Earned Income,' as used in this Agreement, *shall mean all cash compensation for personal services from current or future employment including, but not limited to, wages, salary, bonuses, commissions, consulting, directors and other fees, disability payments, partnership distributions and other remuneration received by the* [defendant] *from employment or which the* [defendant] *shall be entitled to receive from employment,* but has elected to defer or decline, including payments made by the [defendant] to [his] IRA, pension, profit sharing or like retirement plans and payments (but not including payments made by the [defendant] from income on which the [plaintiff] has already received her percentage share). It is the intention of the parties that the [defendant] shall take no action, the specific intention of which is to reduce or divert income or increase business expenses or deductions for the purpose of defeating or reducing his alimony and support obligations to the [plaintiff]. In the event the [defendant] changes the nature of his employment, the definition of 'gross annual income' shall be modified accordingly to reflect the [defendant's] new income, which may include, for example payment in stock, income from one or more businesses, rental income, royalties and partnership distributions." (Emphasis added.)

The plaintiff submits that paragraph 4.3 expressly delineates certain forms of compensation that, per se, qualify as gross annual earned income. Because "partnership distributions" are included among those forms of compensation, the plaintiff argues—and the trial court agreed—that paragraph 4.3 mandates that the distributions from the capital account of the limited partnership constitute gross annual earned income.

The defendant advances a different interpretation. Although he acknowledges that "partnership distributions" specifically are included among the forms of compensation set forth in paragraph 4.3, he nevertheless maintains that the extent to which such distributions may constitute part of his gross annual earned income is qualified by the plain language thereof. He argues that, to be part of his gross annual earned income, the express language of paragraph 4.3 requires partnership distributions to be "compensation for personal services from current or future employment," which also is described in paragraph 4.3 as "remuneration received by [the defendant] from employment or which the [defendant] shall be entitled to receive from employment." The question, then, is whether, by including "partnership distributions" among the forms of compensation specified at the outset of paragraph 4.3, such inclusion obviates the need to demonstrate that those distributions are (1) "compensation for personal services" and (2) "from current or future employment," as the plaintiff argues, or whether those distributions are so qualified, as the defendant maintains. Both are reasonable interpretations of the contractual language in question.

The proper interpretation of gross annual earned income under paragraph 4.3 is further complicated by the fact that the defendant's interest in the capital account of the limited partnership, from which the distributions in question originate, is designated as an asset in the separation agreement. See footnote 9 of this opinion. The separation agreement expressly prohibits the plaintiff from making any claim to that asset, as paragraph 5.8 provides in relevant part that "[t]he [defendant] shall retain the following assets and the [plaintiff] *shall make no claim to them* . . . 3. Cantor Fitzgerald, LP Capital Account and Grant Units worth approximately $325,000 . . . ."[24] (Emphasis added.) It is a cardinal rule of contract interpretation that a contract is to be construed as a whole and all relevant provisions must be considered together, with the aim of giving operative effect to every provision. See, e.g., *C & H Electric, Inc.* v. *Bethel*, 312 Conn. 843, 853, 96 A.3d 477 (2014); *Barnard* v. *Barnard*, 214 Conn. 99, 109, 570 A.2d 690 (1990); *Zahringer* v. *Zahringer*, 124 Conn. App. 672, 684, 6 A.3d 141 (2010). Because the separation agreement specifically proscribes any claim by the plaintiff to the defendant's interest in the capital account of the limited partnership, that contractual provision must be considered in determining whether the parties intended such distributions to constitute gross annual earned income to which the plaintiff may lay claim.[25]

In her appellate brief, the plaintiff argues that because the limited partnership "was the only partnership in which the defendant had an interest when the marriage

was dissolved, it is incomprehensible that the defendant can now suggest that [paragraph] 4.3 did not contemplate that he would pay a percentage of those very distributions as unallocated alimony and support." (Emphasis omitted.) The separation agreement, however, plainly distinguishes among various accounts of the limited partnership, and assigns to the parties' respective interests in those accounts. For example, paragraph 5.8 (3) of the separation agreement states that the defendant shall retain, and the plaintiff shall make no claim to, the capital account of the limited partnership. Paragraph 5.8 (4) likewise provides that the defendant shall retain the "Cantor Fitzgerald, LP High Distribution Units (no value)." By contrast, paragraph 5.10 (6) provides that the interest in the asset described as "Cantor Fitzgerald, LP Profit Sharing" shall be "divided equally between the parties . . . ." This is not a case, therefore, in which the separation agreement addresses only one limited partnership interest. It is conceivable that "partnership distributions," as that terminology is used in paragraph 4.3, refers to distributions from the "Cantor Fitzgerald, LP Profit Sharing" account, to which paragraph 5.10 (6) expressly grants the plaintiff a 50 percent interest.[26]

In considering the plain language of the relevant provisions of the separation agreement, we conclude that the intent of the parties is not clear as to whether the distributions from the capital account of the limited partnership are to be included as part of the defendant's gross annual earned income. The language at issue is reasonably susceptible to more than one interpretation and, thus, is ambiguous. Accordingly, the trial court in the present case "abused its discretion by failing to undertake the factual inquiry necessary to clarify the meaning" of the gross annual earned income provision of the separation agreement. *Parisi* v. *Parisi*, 315 Conn. 370, 379, 107 A.3d 920 (2015).

This court reached a similar conclusion in *Marshall* v. *Marshall*, 151 Conn. App. 638, 97 A.3d 1 (2014). Much like the present case, the issue in *Marshall* was whether certain distributions reflected on the plaintiff's K-1 forms were to be considered "pre-tax income from employment" under the separation agreement between the parties. (Internal quotation marks omitted.) Id., 648. After first determining that the separation agreement was ambiguous on that issue, this court held that "to determine the extent to which K-1 income is to be included in the calculation of [the plaintiff's income], the trial court must engage in fact-finding as to the intent of the parties." Id.

Proper regard for this court's role as an appellate tribunal precludes our consideration of that fact specific inquiry. To do so "would require us to find facts and make credibility determinations, which are not within the province of an appellate court."[27] *Wheela-*

*brator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 361, 130 A.3d 241 (2016). As we have observed, "it is axiomatic that this appellate body does not engage in fact-finding. Connecticut's appellate courts cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." (Internal quotation marks omitted.) *Hogan* v. *Lagosz*, 124 Conn. App. 602, 618, 6 A.3d 112 (2010), cert. denied, 299 Conn. 293, 11 A.3d 151 (2011). Similarly, "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . [W]e must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Altayeb*, 126 Conn. App. 383, 387–88, 11 A.3d 1122, cert. denied, 300 Conn. 927, 15 A.3d 628 (2011); see also *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 859, 74 A.3d 482 (2013) ("this court cannot pass on issues of credibility"). Thus, this case must be remanded to the trial court to resolve the ambiguity in the parties' separation agreement as to whether the parties intended the distributions from the capital account of the limited partnership to be included in the defendant's gross annual earned income. See *Parisi* v. *Parisi*, supra, 315 Conn. 373, 386 (ambiguous provision in separation agreement required remand "for a hearing at which the intent of the parties and the meaning of the term in question must be determined" which entailed "consideration of all available extrinsic evidence and the circumstances surrounding the entering of the agreement"); *Marshall* v. *Marshall*, supra, 151 Conn. App. 648 (ambiguous provision in separation agreement required remand to trial court to determine intent of parties); *Page* v. *Page*, 77 Conn. App. 748, 749, 825 A.2d 187 (2003) (ambiguous provision in separation agreement required remand for evidentiary hearing to establish intent of parties).

## II

In light of our resolution of the defendant's principal claim, which necessitates a remand to the trial court for further proceedings, we need not consider the defendant's remaining claims; see footnote 1 of this opinion; save for his challenge to the award of attorney's fees and expert fees. Those fees were awarded, in the court's discretion, following the determination that the defendant had underpaid his unallocated alimony and child support by $370,440. On remand, it is entirely possible that the trial court, in resolving the ambiguity in the separation agreement as to whether distributions from the capital account of the limited partnership constitute gross annual earned income, may determine that the defendant has not underpaid his unallocated alimony and child support obligation. Accordingly, the predicate to an award of attorney's fees and expert fees is lacking

in the present case. The court's December 9, 2014 award of $44,285.93 in attorney's fees and $14,805.25 in expert witness fees, therefore, must be set aside. See *Roach* v. *Roach*, 20 Conn. App. 500, 508, 568 A.2d 1037 (1990) ("since the financial awards must be retried, the issue of whether the defendant's [legal] fees should be paid must . . . also be left for a redetermination"). As always, the propriety of such an award is entrusted to the discretion of the trial court on remand. See *Jewett* v. *Jewett*, 265 Conn. 669, 694, 830 A.2d 193 (2003); *Rozsa* v. *Rozsa*, 117 Conn. App. 1, 18, 977 A.2d 722 (2009).

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

** April 14, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant also claims that the court improperly precluded certain expert testimony, improperly modified a final property distribution, and improperly calculated the arrearage under the unallocated alimony and child support order. In light of our resolution of the defendant's principal claim, we need not address those issues.

[2] The designation "JDNO" is "a standard notation used to indicate that a judicial notice of a decision or order has been sent by the clerk's office to all parties of record. Such a notation raises a presumption that notice was sent and received in the absence of a finding to the contrary." *Morelli* v. *Manpower, Inc.*, 34 Conn. App. 419, 423, 642 A.2d 9 (1994).

[3] In setting forth the background of this appeal, we do not pass on the credibility of witnesses or engage in fact-finding, as that is the exclusive province of the trial court. See *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) (noting "fundamental distinction" between function of fact finder to make credibility determinations and to find facts and function of appellate tribunal to review, and not to retry, proceedings of trial court). Rather, we simply provide an overview of the procedural history and the evidence that was presented during the three day contempt hearing.

[4] The defendant's objection was filed on May 31, 2013, approximately ten months prior to the hearing before the court.

[5] We note that the separation agreement contains several references to "Cantor Fitzgerald, LP." Paragraph 5.8 (3) of that agreement states that the defendant shall retain the "Cantor Fitzgerald, LP Capital Account and Grant Units worth approximately $325,000." Paragraph 5.8 (4) likewise provides that the defendant shall retain the "Cantor Fitzgerald, LP High Distribution Units (no value)." Paragraph 5.10 (6) provides that the asset described as "Cantor Fitzgerald, LP Profit Sharing" shall be divided equally between the plaintiff and the defendant. Lastly, paragraph 5.13 provides in relevant part that the defendant "is entitled to reimbursement from Cantor Fitzgerald, LP for business expenses incurred . . . and he shall pay to the [plaintiff] one-half (1/2) of such reimbursement expenses as received." The motion for contempt underlying this appeal concerned distributions that the defendant received from the capital account of that limited partnership.

[6] The plaintiff introduced the defendant's 2012 tax return into evidence as a full exhibit. That exhibit includes a copy of the defendant's W-2 form.

[7] That testimony was corroborated by the plaintiff's expert, who testified at the hearing that although he had alleged, in a written report prepared months earlier, that the defendant "was an employee and limited partner" of the limited partnership, he subsequently revised his report to clarify that the defendant "is an employee of Cantor Fitzgerald Securities and a limited partner of the [limited partnership]."

[8] Pursuant to paragraph 5.6 of the separation agreement, the plaintiff retained "ownership of the real estate located at Harbour Village, Ponce Inlet, Florida . . . ."

[9] That testimony comports with the plain language of paragraph 5.8 of the separation agreement, which describes the defendant's interest in the capital account of the limited partnership as an asset, as well as the "Asset

Sheet" that was attached to the separation agreement and designated as Schedule A thereto. Consistent with the provisions of Article V of the separation agreement, Schedule A allocates numerous assets between the parties. The capital account of the limited partnership, from which the distributions in question originate, is listed as an asset of the defendant on that schedule.

The plaintiff's expert likewise testified at the contempt hearing that the defendant's interest in the limited partnership is an asset, and that the partnership distributions that the defendant received from the limited partnership, as reflected on line 19a of his K-1 form, "is a return on investment. . . . By nature that can be nothing other than return on your investment."

[10] "A schedule K-1 is the document that states each individual partner's proportionate income or loss based upon their percentage ownership. The income or loss on the schedule K-1 is in turn reported on each partner's individual tax return." *Nielsen* v. *United States*, 976 F.2d 951, 953 (5th Cir. 1992). "A limited partner is normally informed of the amount of his allowable deductions on a Form K-1, which is prepared and delivered to him by the managing partner of the partnership." *United States* v. *Crooks*, 804 F.2d 1441, app. A 1451 (9th Cir. 1986).

[11] The defendant acknowledged that the disbursements reflected on his K-1 forms could be characterized as partnership distributions. In his testimony, he nevertheless emphasized that they more accurately were described as limited partnership distributions.

[12] The defendant testified in relevant part that "at Cantor Fitzgerald at the end of the year in December, from all the times out during the year, you put in your expenses, and they reimburse you. . . . So I send that out . . . and then the firm reimburses me."

[13] DeCusati's report details the yearly amount of the distributions received by the defendant as follows: 2004 - $58,990; 2005 - $57,343; 2006 - $67,293; 2007 - $76,766; 2008 - $171,062; 2009 - $181,108; 2010 - $85,006; 2011 - $16,070; and 2012 - $100,627. Those distributions total $814,265.

[14] Significantly, DeCusati offered no documentary or testimonial evidence regarding the intent of the parties in crafting the provisions of the separation agreement in question. Rather, he noted in his testimony that the plain language of paragraph 4.3 "specifically states" that partnership distributions are included in the calculation of gross annual earned income.

[15] When asked specifically whether the distributions that the defendant received from the limited partnership were "from employment at [the limited partnership]," DeCusati answered, "Not from employment, no."

[16] As the United States Tax Court has explained, 26 U.S.C. § 469 (a) (2012) "disallows the passive activity loss of an individual taxpayer. Passive activity losses are suspended until the taxpayer either has offsetting passive income or disposes of the taxpayer's entire interest in the passive activity. . . . Congress enacted the passive activity rules in response to concern about the widespread use of tax shelters in which taxpayers were avoiding tax on unrelated income. . . . The [Internal Revenue] Code defines 'passive activity' as an activity involving the conduct of a trade or business in which the taxpayer does not materially participate." (Citations omitted.) *Veriha* v. *Commissioner of Internal Revenue*, 139 T.C. 45, 47–48 (2012). "In general, a taxpayer is treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is: (1) [r]egular; (2) continuous; and (3) substantial." *Estate of Quick* v. *Commissioner of Internal Revenue*, 110 T.C. 172, 184 (1998); see also 26 U.S.C. § 469 (h) (1) (2012). The Internal Revenue Code further provides that "[e]xcept as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates." 26 U.S.C. § 469 (h) (2) (2012).

[17] See *Estate of Quick* v. *Commissioner of Internal Revenue*, 110 T.C. 172, 183, 188 (holding that "the characterization of losses as either passive or nonpassive in the hands of a [limited] partner is an affected item" which involves determination at "partnership level" rather than "partner level" [internal quotation marks omitted]). The second page of the defendant's K-1 form delineates numerous codes utilized therein. With respect to the distributions in question specified on line 19a, that filing states, "See the Partner's instructions."

[18] The propriety of the court's refusal to hold the defendant in contempt is not contested in this appeal.

[19] More than seventeen months after issuing its notice of decision on the motion for contempt and more than fourteen months after this appeal was filed, the trial court—days prior to oral argument before this court—furnished what it termed a "clarification and rectification" of certain rulings,

including its July 23, 2014 determination that the defendant had underreported his gross annual earned income by $370,440. The only clarification germane to the issues presented in this appeal is the revision of the second sentence of the court's July 23, 2014 notice of decision. That sentence originally stated that the court "finds that the plaintiff's evidence of underreporting by the defendant of his 'gross annual earned income' including that of the testimony of her witness who prepared a forensic audit of the defendant's gross annual earned income." The court revised that sentence by adding "is credible" at its end. The court nonetheless did not clarify or articulate its interpretation of the separation agreement in any manner, as the defendant previously had requested in his August 7, 2014 motions for articulation and reargument.

[20] In its January 8, 2016 clarification of its July 23, 2014 notice of decision, the court repeated that language.

[21] Moreover, we note that neither the plaintiff nor her expert offered any evidence regarding the intent of the parties in crafting the disputed provisions of the separation agreement. In her testimony, the plaintiff testified that she did not "know anything . . . financially about . . . the workings of how [the defendant's] income" was computed and "[was] told by" her forensic accountant that "there is income . . . that I am owed through distributions that I have not received according to our divorce agreement." When asked to specify the basis for her claim that the defendant had not paid her 45 percent of his gross annual earned income, the plaintiff testified that the basis "[i]s because once the documents were given to the forensic accountant, he—from what I understand, 45 percent of his income has not been paid to me." The plaintiff's expert and forensic accountant, DeCusati, likewise provided no testimony as to the intent of the parties in crafting the language of the separation agreement in question. See footnote 14 of this opinion. Rather, DeCusati opined that the language at issue plainly and unambiguously provided that partnership distributions were to be included in the definition of gross annual earned income provided in paragraph 4.3 of the separation agreement. Indeed, both the plaintiff and the defendant in this appeal maintain that the relevant provisions of the separation agreement are unambiguous, albeit for different reasons.

We also note that the term "intent" appears but once in the hundreds of pages of contempt hearing testimony in the record before us. On the second day of that hearing, the following colloquy occurred:

"[The Plaintiff's Counsel]: [I]s it your intent, sir, to—or intention to share 45 percent of whatever it reflects on line 19a on the distribution amount with [the plaintiff]?

"[The Defendant]: No.

"[The Plaintiff's Counsel]: Why not?

"[The Defendant]: Because she can make no claim to the asset and it's unearned . . . . [I]t's unearned income and [the plaintiff] explicitly said she can make no claim to this asset."

[22] Following that admonition, the defendant immediately withdrew his request.

[23] Neither party to this appeal has suggested otherwise.

[24] By contrast, the separation agreement provides that the asset described as "Cantor Fitzgerald, LP Profit Sharing" shall "be divided equally between the parties . . . ."

[25] Also problematic is the fact that, although paragraph 5.8 the separation agreement specifically designates the capital account of the limited partnership as an asset of the defendant, it does not reference partnership distributions in any manner. Paragraph 5.8 thus is ambiguous as to whether the parties intended those partnership distributions from the capital account to be considered part and parcel of that asset.

[26] Moreover, the definition of "gross annual earned income" set forth in paragraph 4.3 of the separation agreement pertains to "compensation for personal services from current *or future employment* . . . ." (Emphasis added.) Paragraph 4.3 also addresses the scenario where "the [defendant] changes the nature of his employment," in which case partnership distributions are to be included in a modified definition of gross annual earned income. That language must be considered in ascertaining the intent of the parties in enacting paragraph 4.3. See *Office of Labor Relations* v. *New England Health Care Employees Union, District 1199, AFL–CIO*, 288 Conn. 223, 232, 951 A.2d 1249 (2008) ("[w]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result" [internal quotation marks omitted]).

[27] The plaintiff relies on *Bijur* v. *Bijur*, 79 Conn. App. 752, 831 A.2d 824 (2003), as support for her proposition that "[i]f this court determines that the [separation agreement] is ambiguous, then it simply needs to determine if the trial court's interpretation of the agreement as including partnership distributions in the defendant's income was clearly erroneous." That reliance is misplaced. In *Bijur*, the trial court had treated the contractual language in question "as if it were ambiguous." Id., 762. The trial court in *Bijur* also issued a memorandum of decision, in which it made detailed findings of fact. Id., 757–58. In affirming the judgment of the trial court, this court concluded, "[o]n the basis of a review of [those] facts," that the court's determination as to the intent of the parties in utilizing certain language in the separation agreement was not clearly erroneous. Id., 763. Unlike *Bijur*, the trial court in the present case did not issue a detailed memorandum of decision or articulate any findings of fact with respect to the intent of the parties.

———————————————————