******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JULIE BECUE *v.* MARK BECUE
## (AC 38994)

Alvord, Prescott and Pellegrino, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dissolved, appealed to this court from certain postjudgment orders of the trial court. He claimed, inter alia, that the trial court improperly determined the amount of his child support, arrearage, and expense obligations. The plaintiff cross appealed, claiming that the trial court erred when it denied her motion for contempt in which she alleged that the defendant improperly engaged in self-help by repeatedly modifying or withholding his child support payments. *Held*:

1. The trial court abused its discretion when it declined to find the defendant in contempt for engaging in self-help; the evidence clearly demonstrated that the defendant stopped paying child support in January, 2012, did not resume any type of child support payment for an entire year despite new gainful employment and, thereafter, changed the amount he decided to pay, and it was undeniable that the defendant made those modifications to his court-ordered child support without the court's permission, chose not to comply with the court's child support order and, thus, wilfully engaged in self-help in breach of that order.

2. The trial court properly determined the defendant's child support, arrearage, and expense obligations: contrary to the defendant's contention, the trial court's net income findings had an evidentiary basis in the record, the defendant did not explain how the court's use of Judicial Branch software to assist with calculations was extra-evidentiary, provided the data being input was based on the evidence or matters for which the court properly took judicial notice, and all of the named documents on which the court stated it relied, as well as many other financial documents, were contained in the record; moreover, the defendant's claim that the court failed to give consideration to his request for a deviation from the presumptive amount of child support failed, as the record established that the court considered the defendant's request for a deviation and stated on the record that if it found any merit to the defendant's request it would permit further argument on it, and the trial court's response to the defendant's motion for reargument on his request for a deviation was appropriate in that the court considered the issues raised and submitted a corrected memorandum of decision in which it determined that it would be equitable and appropriate not to deviate from the child support guidelines, which was not an abuse of discretion, as the dissolution court did not make a finding on the record that the application of the guidelines would be inequitable or inappropriate at the time it rendered judgment incorporating the parties' dissolution agreement, and in the absence of such a finding, the trial court had the discretion to consider the question of a modification of child support anew in accordance with the guidelines, and found a substantial change in circumstances such that a deviation from the guidelines would have been inappropriate and inequitable and would have left the plaintiff with insufficient funds to meet the needs of the parties' children.

3. The defendant's claim that the trial court abused its discretion in ordering him to pay $50,000 in attorney's fees to the plaintiff lacked merit; the parties' dissolution agreement provided for the payment of attorney's fees in the event a breach occurred, and the court's finding that the defendant had breached a provision of the agreement regarding child support when he reduced his child support payments unilaterally without court intervention was amply supported by the evidence in the record.

4. The trial court did not abuse its discretion when it declined to hold the plaintiff in contempt for allegedly violating the parties' dissolution agreement; the court specifically found that the paragraph at issue involving the filing of tax returns was ambiguous, and that the defendant had failed to prove by clear and convincing evidence that the plaintiff wilfully violated the provision, as the court found that to the extent the plaintiff may have breached the agreement, her breach was not wilful but was

based on a good faith misunderstanding of the ambiguous provision.

5. The trial court did not abuse its discretion when it held the defendant in contempt for failing to make certain child support payments; the record was clear that the orders that the defendant violated were clear and unambiguous and amply supported the trial court's finding that the defendant's failure to abide by the court's order was wilful, as it was undisputed that the defendant failed to pay any amount of child support from May through August, 2015, and as a result of the defendant's unilateral decision to stop paying child support during that time, it was not an abuse of discretion for the court to find the defendant in wilful contempt.

Argued May 29—officially released November 6, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Stanley Novack*, judge trial referee; judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Shay, J.*, granted the plaintiff's motion for order and motions for attorney's fees, denied the plaintiff's motions for contempt, granted the defendant's motion for modification, and denied the defendant's motions for contempt, motions for attorney's fees, motions for order, and motions to compel; subsequently, the court, *Hon. Michael E. Shay*, judge trial referee, issued a corrected memorandum of decision, and the defendant appealed and the plaintiff cross appealed to this court; thereafter, the court, *Hon. Michael E. Shay*, judge trial referee, granted the defendant's motion for articulation. *Reversed in part*; *further proceedings*.

*John H. Van Lenten*, for the appellant-cross appellee (defendant).

*Richard W. Callahan*, for the appellee-cross appellant (plaintiff).

*Opinion*

PELLEGRINO, J. In this postdissolution matter, the defendant, Mark Becue, appeals from the judgment of the trial court, resolving several of the parties' postjudgment motions. The defendant claims that the court improperly: (1) determined the amount of his child support and his arrearage obligations due to four specific errors; (2) ordered him to pay $50,000 toward the attorney's fees of the plaintiff, Julie Becue; (3) declined to hold the plaintiff in contempt; and (4) held him in contempt for failing to make certain child support payments. The plaintiff, Julie Becue, cross appeals from the court's judgment. Specifically, she claims that the court erred when it denied her motion for contempt, number 157, in which she alleged that the defendant improperly had engaged in self-help by repeatedly modifying or withholding his child support payments. We disagree with all of the defendant's claims, and we agree with the claim raised in the plaintiff's cross appeal. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following procedural history, although complicated, is relevant. The court dissolved the parties' marriage on March 16, 2010. At that time, the parties had three minor children, the oldest of whom was eleven. The court found that the parties' marriage had broken down irretrievably, and it accepted, as fair and equitable, the parties' written separation agreement and parenting plan (agreement), which the court incorporated by reference into the dissolution judgment. The agreement provided that the parties would share joint legal and physical custody of their minor children and that the defendant would pay to the plaintiff $260 per week in child support, which the court recognized was a deviation from the presumptive amount of $451 as calculated using the child support guidelines.[1] The court also found that this deviation would not negatively impact the children.[2]

Approximately two years later, the parties began to file a seemingly endless stream of motions. On February 2, 2012, the plaintiff filed a postjudgment motion for contempt, number 157, alleging that, as of January 1, 2012, the defendant had failed to comply with the court's order that he pay $260 per week in child support. The plaintiff also filed a motion for attorney's fees, number 158, on the same date.

On February 7, 2012, the defendant filed a motion for modification, number 159.01, on the ground that there had been a substantial change in circumstances. He alleged that he no longer was employed at the rate of $205,000 per year, and, in accordance with paragraph 5.1 of the parties' agreement; see footnote 1 of this opinion; he, therefore, was not required to pay child support. The defendant also sought, inter alia, to have

the plaintiff pay child support to him.[3]

On April 5, 2012, the defendant filed a motion for contempt, number 166, on the ground that the plaintiff had violated the parenting plan contained in the parties' agreement, and, on April 17, 2012, he filed a motion, number 169, for attorney's fees. On July 19, 2012, the defendant filed three additional motions for contempt, numbers 181, 182, and 183, on the ground that the plaintiff had violated the parenting plan contained in the parties' agreement, and that she had failed to provide an itemized accounting. On August 3, 2012, the defendant filed another motion for contempt, number 190, on the ground that the plaintiff was in violation of the parenting plan. Also on August 3, 2012, the plaintiff filed a motion for contempt, number 188, on the ground that the defendant had failed to comply with discovery, and a motion for order, number 189, requesting that the court set the percentages that the parties must pay for the children's summer camp.

On January 25, 2013, the defendant filed a motion for order, number 193, requesting that the court grant to him the final authority on all major decisions affecting the minor children. On April 30, 2013, the defendant filed three additional motions for order, numbers 194, 195, and 196, requesting that the court order the plaintiff to sign authorizations for the defendant to obtain several years of her federal and state tax returns. On May 31, 2013, the defendant filed another motion for contempt, number 197, on the ground that the plaintiff again had violated the parenting plan contained in the parties' agreement.[4] On November 18, 2013, the defendant filed a motion for order, number 200, requesting that the court direct the plaintiff to comply with various provisions of the parties' agreement regarding health insurance for the children.[5] On December 9, 2013, the defendant filed another motion for contempt and motion to compel, numbers 201 and 202, regarding the plaintiff's tax returns. On December 31, 2013, the plaintiff filed a motion for contempt, number 203, regarding the defendant's child support obligation.[6]

On December 29, 2014, and January 5, 2015, the defendant filed two more motions for contempt, numbers 213 and 214, the first alleging that the plaintiff was in violation of the parenting plan set forth in the parties' agreement, and the second alleging that the plaintiff was in violation of an aspect of the agreement concerning her tax returns, and a motion to compel, number 215. On January 26, 2015, the plaintiff filed a motion for attorney's fees,[7] number 216, and, on April 27, 2015, the defendant filed a motion for attorney's fees, number 223.

Following a four day hearing involving more than twenty motions, and the submission of proposed orders and financial affidavits by each of the parties, the court, on August 27, 2015, issued a memorandum of decision.

Shortly after the court rendered judgment, the plaintiff filed a motion to reargue/reconsider, asking the court to correct certain findings and mathematical calculations contained in the original memorandum of decision. The court granted that motion and, on February 23, 2016, issued some corrections to its August 27, 2015 memorandum of decision. Taking into consideration the original and the corrected memoranda of decision, the court made the following rulings on the relevant motions of the parties.

Regarding the plaintiff's postjudgment motion for contempt, number 157, her motion for attorney's fees, number 158, and the defendant's motion for modification, number 159.01, the court denied the motion for contempt, granted the motion for attorney's fees, and granted the motion for modification. The court found that the defendant's position that, on the basis of paragraph 5.1 of the parties' agreement, he could reduce his child support unilaterally, without court intervention, if his earnings were less than $205,000 per year, was "completely unreasonable and without merit." Nevertheless, the court found that the defendant's unilateral actions, "under all the facts and circumstances . . . do not amount to wilful contempt in that he had, in good faith, relied upon professional assistance in the preparation of the child support guidelines worksheets that formed the basis of his modified child support payments." The court also determined that a substantial change in circumstances had arisen in that the defendant had become unemployed at the time he filed his February 7, 2012 motion for modification. After calculating the amount of support due during the various periods of changing income, the court concluded that the defendant had an arrearage, as of June 30, 2015, in the amount of $59,254. It also concluded that the defendant's share of support for the parties' minor children, as of June 30, 2015, was $539 per week. Additionally, the court also concluded that the plaintiff was entitled to reasonable attorney's fees because the defendant had breached the agreement of the parties.

Regarding the defendant's April 5, 2012 motion for contempt, number 166, and his motion for attorney's fees, number 169, the court denied both motions, finding that the defendant had not met his burden of proof on the contempt allegation.

Regarding the defendant's motions for contempt, numbers 181, 182, and 183, and the plaintiff's motion for contempt, number 188, the court denied those motions, finding that any violation of the parenting plan by the plaintiff was de minimus, and that each of the parties had failed to establish contumacious behavior on the part of the other party.

Regarding the plaintiff's motion for order, number 189, requesting that the court set the percentages that the parties must pay for summer camp, the court found

that the parties' agreement was silent on this issue and that the children would be best served if each party contributed to the activities on a predetermined basis such as they do for reasonable medical expenses.

Regarding the defendant's motions for contempt, numbers 190 and 213, alleging that the plaintiff was in violation of the parenting plan, the court found that the defendant had failed to meet his burden of proof and that the plaintiff had attempted to address these issues with the defendant, but that the defendant had failed to respond in a good faith manner.

Regarding the defendant's motion for order, number 193, requesting that the court grant to him final authority on all major decisions affecting the minor children, the court found that giving the defendant such authority would not be in the best interest of the children because the defendant had "exhibited a pattern of rigidity, close-mindedness, and vindictiveness in his dealings with the [plaintiff] . . . ."

Regarding the defendant's motions for order, numbers 194, 195, and 196, requesting that the court order the plaintiff to sign authorizations for the defendant to obtain several years of her federal and state tax returns, the court denied those motions, concluding that, although the evidence supported a finding that the plaintiff inadvertently overpaid her taxes, the order requested by the defendant was unnecessary and unwarranted.

Regarding the defendant's motion for contempt, number 197, again alleging that the plaintiff violated the parenting plan, the court denied this motion concluding that the "testimony and evidence clearly support a finding that the [plaintiff] has not interfered with the exercise of the [defendant's] parenting rights . . . [that] the [defendant's] position is supported by neither law nor logic nor the facts . . . and [t]hat the [defendant's] claim is both mean-spirited and without merit . . . ."

Regarding the defendant's motion for order, number 200, requesting that the court direct the plaintiff to comply with various provisions of the parties' agreement regarding health insurance for the children, the court found that the basis of the defendant's motion did not involve any alleged failure by the plaintiff to maintain the children on her health insurance, but, rather, that it was about the defendant wanting control of the plaintiff's health savings debit card. The court found the defendant's position on this issue both "far-fetched" and "unsupportable by law." As to the plaintiff's motion for contempt, number 203, the court determined that the plaintiff had withdrawn this motion.

Regarding the defendant's motions for contempt and to compel, numbers 201, 202, 214, and 215, alleging that the plaintiff was in violation of an aspect of the agreement concerning her tax returns, the court found

that the defendant had failed to meet his burden of proof.

Regarding the plaintiff's motion for attorney's fees, number 216, and the defendant's motion for attorney's fees, number 223, the court found that the plaintiff was entitled to reasonable attorney's fees due to the defendant's breach of the parties' agreement, but that the defendant was not entitled to attorney's fees.

This appeal followed. Additional facts will be set forth as necessary. We first consider the plaintiff's cross appeal, followed by each of the issues raised by the defendant in his appeal.

I

THE PLAINTIFF'S CROSS APPEAL

The plaintiff claims in her cross appeal that the court erred when it declined to hold the defendant in contempt for engaging in self-help by repeatedly modifying his child support payments without an order of the court. She argues that the evidence demonstrates that the defendant wilfully violated the child support order on multiple occasions and that there is nothing in the record to support the court's conclusion that the defendant's repeated self-help should be excused because of a good faith dispute or a misunderstanding. On the basis of the evidence and the court's factual findings, we agree.

The record reveals that at the time of the dissolution in March, 2010, the defendant had received an offer of employment with a salary of $205,000, but he had not yet started his new job. Initially, the defendant met his child support obligation of $260 per week, but in late 2011 he became unemployed. Thereafter, on January 1, 2012, the defendant ceased paying child support, and, on February 2, 2012, the plaintiff filed a motion for contempt and a motion for attorney's fees. The defendant, on February 7, 2012, filed a motion for modification of the child support order on the ground that his unemployment constituted a substantial change in circumstances. As set forth extensively in our overview of the procedural history of this case, many more motions were filed by both parties.

Before these motions were heard by the court, the defendant repeatedly modified or withheld his child support payments. In response to changes in his income, the defendant recalculated his child support obligation on the basis of his then present income, using a deviation factor, and he offset what he calculated he owed against what he calculated he had overpaid to the plaintiff during the early period of his unemployment.

The court explained the defendant's position as follows: "[I]f at any time he is not earning $205,000 [per] year, he has the right to arbitrarily recalculate child support on a fluctuating basis depending upon his [then]

present income." The court specifically found that the language in paragraph 5.1 was clear and unambiguous, and that the defendant's position was "both completely unreasonable and without merit." The court also found that although "the [bracketed] phrase [in the agreement] taken by itself (the brackets are in the original) would appear to support [the defendant's construction], he has taken that phrase completely out of context." Nevertheless, the court found that the defendant's unilateral modifications of his child support obligation were not wilful because "he had, in good faith, relied upon professional assistance in the preparation of the child support guidelines worksheets that formed the basis of his modified child support payments." The plaintiff claims that this was error. We agree.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . A contempt judgment cannot stand when, inter alia, the order a contemnor is held to have violated is vague and indefinite, or when the contemnor, through no fault of his own, was unable to obey the court's order. . . .

"Consistent with the foregoing, when we review such a judgment, we first consider the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . .

"Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [party] were in contempt of a court order. To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt." (Citation omitted; internal quotation marks omitted.) *Hirschfeld* v. *Machinist*, 181 Conn. App. 309, 318–19, 186 A.3d 771, cert. denied, 329 Conn. 913, 186 A.3d 1170 (2018).

We first consider whether the order at issue is clear and unambiguous. Accordingly, we begin with the language of paragraph 5.1 of the parties' agreement, which was incorporated into the judgment of dissolution: "[T]he Husband shall during his lifetime pay the Wife the sum of $260.00 per week as and for child support pursuant to the child support guidelines [provided he is employed at the rate of Two Hundred and Five Thousand ($205,000.00) Dollars per year]. The Husband's obligation with respect to each child shall terminate

when the child attains age eighteen (18), or if a child is still attending high school when he or she attains age eighteen (18)[8] and graduates high school, whichever event shall first occur." (Footnote added.)

The plaintiff argues that the trial court correctly found this provision to be clear and unambiguous in requiring the defendant to pay a weekly child support obligation of $260, based upon his anticipated annual income of $205,000. We agree. The provision clearly sets forth that the defendant, on the basis of his anticipated income of $205,000, will pay to the plaintiff child support in the amount of $260 per week "pursuant to the child support guidelines." There is nothing in the agreement that would permit the defendant to stop paying support or to change the amount of support, unilaterally, if his income later changed.

We next consider whether there is clear error in the court's finding that the defendant's disobedience of the court's child support order and his failure to seek a subsequent court order before repeatedly modifying his child support payments was wilful or was otherwise excused by a good faith dispute or misunderstanding. The plaintiff argues that the defendant's construction of the agreement, as one permitting him to engage in self-help whenever his income changed, specifically and pointedly was found by the court to be "both completely unreasonable and without merit." She contends that these findings demonstrate wilfulness, and that the court's later finding that the defendant's actions were not wilful is clear error. We agree.

In this case, the court specifically found that the defendant breached the order of the court. It further found that the defendant's position that he unilaterally or without leave of the court could recalculate and change or withhold his child support payments on the basis of his changing income was "both completely unreasonable and without merit." The court also explained: "While the phrase [in paragraph 5.1] taken by itself . . . would appear to support [the defendant], he has taken that phrase completely out of context. . . . [W]hen taken in context, the clear meaning of the phrase is that the initial amount of support is tied to that level of income [($205,000)], and does not preclude a modification by either party in the event of a substantial change of circumstances or substantial deviation from the child support guidelines." (Citations omitted; internal quotation marks omitted.) Despite finding that the defendant was in breach of the court's order, that his construction of the bracketed language in that order was "completely unreasonable and without merit," and that he had taken the language out of context, the court went on to find that the defendant's "actions [did] not amount to wilful contempt in that he had, in good faith, relied upon professional assistance in the preparation of the child support guidelines worksheets that formed

that basis of his modified child support payments."

That the defendant may have relied on professional financial assistance to facilitate the preparation of child support guideline worksheets in *December, 2014*,[9] sheds no light on whether his decision to engage in self-help beginning in *January, 2012*, was wilful or was based on a good faith dispute or misunderstanding. The professional advice sought by the defendant was limited to recalculating his child support obligation on the basis of his changes in income. There is no evidence in the record that the defendant sought appropriate legal advice regarding his right to unilaterally modify his support obligation.

In this matter, the court specifically found that the defendant's construction of the child support order was "both completely unreasonable and without merit," and that he had taken the bracketed language in that order completely out of context. We conclude that these findings evince a wilful decision by the defendant to engage in self-help, a decision that this court cannot and will not condone, and that the trial court's later finding that the defendant, in good faith, sought assistance in preparing new child support guidelines worksheets does not excuse his decision not to seek the guidance of the court rather than engage in self-help. See *Behrns* v. *Behrns*, 80 Conn. App. 286, 292, 835 A.2d 68 (2003) ("[W]e will not countenance one party's interpreting the term and undertaking unilateral action to the detriment of the other party. In such a circumstance, the party seeking to alter payments must seek the assistance of the court."), cert. denied, 267 Conn. 914, 840 A.2d 1173 (2004). The evidence clearly demonstrates that the defendant stopped paying child support in January, 2012, and did not resume any type of child support payment for an entire year, despite new gainful employment, that he thereafter changed whatever amount he decided to pay, apparently on the basis of some fluctuation in his income,[10] and that he did not seek advice from Mitchell, the financial advisor, until late December, 2014, nearly three years after he first engaged in self-help. Furthermore, the defendant's hiring of Mitchell to facilitate the preparation of child support guideline worksheets, even if done sooner, would not excuse his decision to engage in self-help. It is undeniable that the defendant made these modifications to his court-ordered child support without the permission of the court. There can be no dispute, our law is quite clear: "An order of the court must be obeyed until it has been modified or successfully challenged." (Internal quotation marks omitted.) *Eldridge* v. *Eldridge*, 244 Conn. 523, 530, 710 A.2d 757 (1998). Although a good faith dispute or the inability of a party to obey an order of the court; see id., 532; may be raised as a defense to a contempt allegation, in this case, the evidence supports but one conclusion; the defendant chose not to comply with the court's child support order, and he

wilfully engaged in self-help in breach of that order. Accordingly, we conclude that the court abused its discretion when it declined to find the defendant in contempt for engaging in self-help.

## II

### THE DEFENDANT'S APPEAL

In his appeal, the defendant claims that the court improperly: (1) determined his child support and his arrearage obligations; (2) ordered him to pay $50,000 toward the attorney's fees of the plaintiff; (3) declined to hold the plaintiff in contempt; and (4) held him in contempt for failing to make certain payments of child support. We consider each of these claims in turn.

### A

The defendant claims that the court "improperly determined the defendant's child support, arrearage, and expense obligations." The defendant raises four specific arguments in support of his claim: (1) "The trial court's admission that it used the Family Law Software program, *combined* with its inability to articulate the figures it relied upon to arrive at the net numbers, confirms that the trial court used an improper source (posttrial, nonevidentiary tax calculations) to arrive at the net incomes"; (emphasis in original); (2) the court improperly failed to consider the defendant's request for a deviation from the presumptive amount of child support, (3) the court impermissibly modified its decision in response to the defendant's motion for reargument/reconsideration, and (4) the court abused its discretion in determining it was equitable and appropriate not to deviate from the child support guidelines.

The following additional facts inform our review of this claim and each supporting argument. In its August 27, 2015 memorandum of decision, the court made the following net income findings. For the period of March 1, 2012 through May 31, 2012 (first time period), the defendant's weekly net income was $750, and the plaintiff's weekly net income was $1304. On the basis of the parties' combined weekly net income, the court determined that the presumptive child support for the first time period was $474 per week, and that the plaintiff's share was $302 per week.

For the period of June 1, 2012 through December 31, 2012 (second time period), the defendant's weekly net income was $2981, and the plaintiff's weekly net income was $1304. On the basis of the parties' combined weekly net income of $4290 per week, the court determined that it was appropriate to deviate upward and apply 17.16 percent to the excess income over $4000 per week. See Regs., Conn. State Agencies § 46b-215a-2b (a) (2) (repealed July 1, 2015) ("[w]hen the parents' combined net weekly income exceeds [$4000], child support awards shall be determined on a case-by-case basis, and the current support prescribed at the [$4000] net

weekly income level shall be the minimum presumptive amount"). After applying the upward deviation, the court calculated that the presumptive child support was $736 per week ($686 plus $50), of which the defendant's share was $512.

For the period of January 1, 2013 through June 30, 2015 (third time period), the court found that the defendant's weekly net income was $3321 and the plaintiff's was $1400. On the basis of the parties' combined weekly net income of $4720 per week, the court determined that it was appropriate to deviate upward and apply 17.16 percent to the excess net income over $4000 per week. After applying the upward deviation, the court calculated that the presumptive child support was $766 per week ($686 plus $80), of which the defendant's share was $539. On the basis of its findings and calculations, the court determined that "for the period [of] January 1, 2012 through June 30, 2015, the [defendant] owed a total of $87,693 in child support . . . that he [had] paid a total of $24,513, leaving an arrearage of $63,180, and that [his] net arrearage [was] $59,254 after applying a credit of $3926 for the [plaintiff's] arrears."

Following the defendant's appeal from the court's judgment, he filed a motion for articulation, requesting, inter alia, that the trial court articulate the following: (1) the legal and factual bases for the court's findings of the parties' net income for each of the three time periods; (2) the evidentiary sources for the court's calculations of the parties' gross incomes for each time period, including what sources of income were included or excluded; and (3) the evidentiary sources for the court's calculations of the parties' net incomes for each time period, including what amounts and sources the court did or did not deduct from the parties' gross incomes to calculate their net incomes.

On November 2, 2016, the court granted the defendant's motion for articulation and provided the following articulation: "In attempting to fully articulate this part of its decision, the court has reviewed the file, the evidence, transcripts of the hearings, its trial notes, and the child support and arrearage guidelines effective August 1, 2005. Nevertheless, the court did not save any rough calculations of income and deductions, nor has it saved any printed drafts of child support guidelines utilizing the Family Law software program [(software)]. Moreover, the court is not in a position to recreate [the] same, since the software program has been updated to reflect changes made since the effective date of the current child support guidelines and arrearage guidelines (July 1, 2015). Therefore, except as noted below, the court is not in a position to say with any specificity the income and deductions it may have relied upon to arrive at the net number.

"Accordingly, the court hereby articulates its decision as follows:

"1. The legal basis for the court's original findings is the mandate that an order of child support be based upon the net income of the parties. . . .

"2. As to the period March 1, 2012 through May 31, 2012, the court based the plaintiff's net income of $1304 per week and the defendant's net income of $750 per week on, inter alia: (a) the plaintiff's financial affidavit (exhibit 50) dated April 25, 2012; (b) on the defendant's other income, *excluding* his income from wages as shown on line 7, and *including* his unemployment compensation of $15,570, all as shown on lines 8a, 9a, 10, 13, and 19 of his 2012 federal income tax return (form 1040) and his 2012 state of Connecticut form CT-1040 (exhibit 14); and (c) a child support guidelines worksheet prepared by the plaintiff's counsel and filed with the court at time of hearing on May 1, 2015 . . . without objection by [the] defendant's counsel, both counsel reserving the right to argue the methodology and accuracy of the calculations at the time of final argument. . . .

"3. For the period June 1, 2012 through December 31, 2012, the court based the plaintiff's net income of $1304 per week, and the defendant's net income of $2981 per week on, inter alia: (a) the plaintiff's financial affidavit (exhibit 50) dated April 25, 2012; (b) on the defendant's income, *excluding* his unemployment compensation of $15,570, all as shown on lines 8a, 9a, 10, and 13 of his 2012 federal income tax return form (1040), and his 2012 state of Connecticut form CT-1040 (exhibit 14); and (c) a child support guidelines worksheet prepared by the plaintiff's counsel and filed with the court at time of hearing on May 1, 2015 . . . without objection by [the] defendant's counsel, both counsel reserving the right to argue the methodology and accuracy of the calculations at the time of final argument. . . .

"4. For the period January 1, 2013 through June 30, 201[5], the court based the plaintiff's net income of $1400 per week, and the defendant's net income of $3321 per week on, inter alia: (a) the plaintiff's financial affidavit . . . dated April 29, 2015; (b) the defendant's financial affidavit . . . dated April 28, 2015; (c) the defendant's 2013 [federal income] tax return (form 1040) and his 2013 state of Connecticut form CT-1040 (exhibit 36); and (d) a child support guidelines worksheet prepared by the plaintiff's counsel and filed with the court at time of hearing on May 1, 2015 . . . without objection by [the] defendant's counsel, both counsel reserving the right to argue the methodology and accuracy of the calculations at the time of final argument." (Citations omitted; emphasis in original.)

We next set forth our standard of review. "[W]e will not disturb the trial court's ruling on a motion for modification of alimony or child support unless the court has abused its discretion or reasonably could not con-

clude as it did, on the basis of the facts presented. . . . Furthermore, [t]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Norberg-Hurlburt* v. *Hurlburt*, 162 Conn. App. 661, 672–73, 133 A.3d 482 (2016).

We consider each of the defendant's arguments in support of his claim that the court "improperly determined the defendant's child support, arrearage, and expense obligations" in turn.

1

The defendant argues that the court improperly determined the amount of presumptive support for each time period because its net income findings had no evidentiary basis as demonstrated by the court's failure to make any explicit findings on gross income or on the specific deductions it used to calculate the parties' net incomes. More specifically, the defendant argues: "[T]he gravamen of the defendant's claim is that the trial court used posttrial, nonevidentiary tax calculations generated by the [software] for the creation of its net income figures. The trial court's admission that it used the [software], *combined* with its inability to articulate the figures it relied upon to arrive at the net numbers, confirms that the trial used an improper source (posttrial, nonevidentary tax calculation) to arrive at the net incomes." (Emphasis in original.)

Relying on *Ferraro* v. *Ferraro*, 168 Conn. App. 723, 728–33, 147 A.3d 188 (2016), the defendant contends that because the court could not recreate in its articulation its calculations regarding gross income and deductions for each of the three time periods, the court's decision must be reversed and the matter remanded for a new hearing on child support. He further argues: "Because the trial court cannot recreate any of the child support guidelines worksheet[s] for any of the three time periods, due to the software program update, it is [in]disputable that the trial court relied on posttrial calculations generated by the software program, and not exclusively on the evidence submitted by the parties at trial. If the court did not rely on posttrial calculations generated by the software program . . . the court could have recreated the child support worksheets and identified, with specificity, the income and deductions that it relied upon to arrive at the respective parties' net income for each period. . . . Therefore, the court's findings here as to the parties' net income were likewise without evidentiary support." (Citations omitted; internal quotation marks omitted.)

The plaintiff argues that the defendant fails to provide any "analysis as to whether the evidence does, or does not, support the numbers contained within the guidelines relied upon by the trial court. The defendant simply argues that because the trial court cannot articulate how it arrived at the figures in the guidelines more than one year after its decision, this court should reverse [the judgment]. . . . Aside from the fact that there is evidence in [the] record to support the numbers in the guidelines utilized by the trial court . . . an appellate court should not reverse a child support order unless there [is] no evidence to support the calculation or it substantially deviates from the presumptive guideline without explanation . . . ." Having thoroughly reviewed the record in this case, we conclude that there is evidence to support the court's net income determinations for each of the three time periods in question. Accordingly, we find no merit in the defendant's argument.

"[T]he [child support] guidelines incorporate [our] statutory rules and contain a schedule for calculating the basic child support obligation, which is based on the number of children in the family and *the combined net weekly income* of the parents." (Emphasis added; internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 337, 152 A.3d 1230 (2016). "It is well settled that a court must base child support . . . orders on the available net income of the parties, not gross income." (Internal quotation marks omitted.) *Tuckman* v. *Tuckman*, 308 Conn. 194, 209, 61 A.3d 449 (2013). In reviewing a decision of the trial court, "[w]e allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Valentine* v. *Valentine*, 164 Conn. App. 354, 369, 141 A.3d 884, cert. denied, 321 Conn. 917, 136 A.3d 1275 (2016).

Here, the defendant argues that "the court's findings . . . as to the parties' net income were . . . without evidentiary support," and, therefore, that the court improperly determined the amount of presumptive support for each time period. He bases this argument on the court's use of the software provided by the Judicial Branch and the fact that the court could not recreate its previously discarded worksheets using that software because it had been updated since the time of trial. Relying on *Ferraro*, the defendant contends that this proves that the court indisputably "relied on posttrial calculations generated by the software program, *and not exclusively on the evidence* submitted by the parties at trial." (Emphasis added.) The defendant does not explain how the use of the software to assist with *calculations* constitutes outside "evidence," and we conclude that the use of this software for *calculations* is no more extra-evidentiary than would be the use of a calculator, provided the data being input by the court

is based on the evidence or on matters for which the court properly has taken judicial notice.

In *Ferraro*, which is the only case relied on by the defendant to support his argument, the defendant husband claimed that the court had made factual findings regarding his net income without evidentiary support. *Ferraro* v. *Ferraro*, supra, 168 Conn. App. 728. The defendant husband contended that the trial court had relied on information not found in the evidence, rather than on the parties' financial affidavits or other evidence presented at trial, to determine his net income. Id. This court stated it was "undisputed that the court relied on the . . . worksheet [generated by the software] in determining the weekly net incomes of the parties," and that it was "evident . . . that the figures in the worksheet [did] not match the figures provided by the parties at trial." Id., 729. Although this court recognized that the trial court was permitted to take judicial notice of certain supplemental information, such as the Internal Revenue Code or tax tables, it concluded that the trial court should have notified the parties that it was doing so, and it should have given them an opportunity to be heard. Id., 731. Because the net income determination made by the trial court had *no evidentiary basis*, the defendant was entitled to a new hearing. Id., 733. After examining the record in the present case, we conclude that there is an evidentiary basis for the court's net income findings, and, therefore, *Ferraro* is distinguishable.

Here, the court explicitly found that for the first time period (from March 1, 2012 to May 31, 2012) the defendant's weekly net income was $750, and the plaintiff's weekly net income was $1304. It stated that it based those figures on documents, including the plaintiff's April 25, 2012 financial affidavit, the defendant's 2012 tax forms, and the child support guidelines worksheet prepared by the plaintiff's attorney, which was provided to the court without objection by the defendant. The defendant does not explain why or how the net income findings are incorrect or what the correct figures should be. In fact, a close reading of his appellate brief reveals no allegation that these figures are incorrect. Rather, his argument is that because the court stated that it could not recreate its worksheets because the software had been updated, then the court, necessarily, must have relied on outside evidence in determining the parties' net income. We do not agree.

All of the named documents on which the court stated it relied, as well as many other financial documents, are contained in the record. We thoroughly have reviewed these documents and the entire evidentiary record, and, on the basis of the evidence presented at trial, we conclude that the court's findings as to net income have an evidentiary basis, as demonstrated herein.

For the first time period, the court stated that it relied

on the plaintiff's financial affidavit dated April 25, 2012, the defendant's nonwage income from his 2012 federal tax return,[11] specifically, the income shown on lines 8a, 9a, 10, 13, and 19, the defendant's 2012 state tax return, and a child support guidelines worksheet prepared by the plaintiff's counsel, as well as on other documents. Line 19 of the defendant's 2012 federal tax return shows that he had income of $15,570 from unemployment. Taking the $15,570 he earned for the first five months of the year on unemployment compensation, and dividing that by twenty-two weeks (January 1 through May 31, 2012), which is his entire time period of unemployment in 2012, we arrive at an earnings from unemployment compensation of $708 per week.

In addition to his unemployment income in the first time period, line 8a of the defendant's 2012 federal tax return shows that the defendant earned $139 from interest, line 9a shows that he earned $6263 from dividends, line 10 shows $16,503 from the prior year's tax refund, and line 13 shows that he sustained a $3000 capital loss, for a total additional income of $19,905 in 2012. This additional income was earned over the course of the entire year, not just in the first time period. Taking the additional income of $19,905 and dividing that by fifty-two weeks, we compute additional earnings of $383 per week. Combining these two numbers ($708 plus $383), we arrive at the defendant's gross weekly income of $1091 for the first five months of 2012.

Line 44 of the defendant's 2012 federal tax form shows that he had a federal tax liability of $11,739, and his state tax form shows a state tax liability of $5820, which, combined, equals a 2012 tax liability of $17,559 or $338 per week. Deducting the $338 weekly tax liability for 2012 from the weekly nonwage income for 2012 of $1091, we arrive at a net weekly income of $753. Allowing for very minor rounding adjustments, this figure coincides with the finding of the trial court that the defendant's weekly net income for the first period was $750. According, we conclude that the court's finding as to the defendant's net weekly income for the first time period has an evidentiary foundation.

As to the plaintiff's net weekly income for the first time period, the court found that her weekly net income was $1304. It stated that it used, among other documents, the plaintiff's financial affidavit and her child support worksheet to arrive at this figure. The plaintiff's W-2 form for 2012 shows her gross income of $97,883. It also shows that the plaintiff paid Medicare taxes of $1419 and made mandatory pension contributions of $7083. According to the plaintiff's 2012 tax returns, she had a federal tax liability of $12,270, and a state tax liability of $4387. Using these figures, the plaintiff's 2012 net income was $72,724. However, the undisputed evidence also demonstrates that the plaintiff maintained health insurance for herself and the parties' minor chil-

dren, and although that amount is not readily available for this time period, the court certainly had evidence from other years to calculate a reasonable amount for that deduction. Additionally, there was evidence that the plaintiff paid union dues every year. Using the 2013 deduction of $3000 for health insurance and $768 for union dues, the plaintiff's approximate net income for 2012 was $68,956 or $1326 per week. Allowing for reasonable differences in rounding, we conclude that the court's weekly net income finding of $1304 for the plaintiff for the first time period has an evidentiary basis.

As to the second time period, from June 1, 2012 through December 31, 2012, the court stated that it based the plaintiff's net income of $1304 per week, and the defendant's net income of $2981 per week on documents including the plaintiff's April 25, 2012 financial affidavit, the defendant's income, as shown on lines 8a, 9a, 10, and 13 of his 2012 federal income tax return and his 2012 state tax form, *not including* the $15,570 in unemployment income received early in the year (line 19), and on the child support guidelines worksheet prepared by the plaintiff's counsel.

The defendant's income for 2012, as shown on his 2012 federal tax return, *excluding unemployment income* from line 19, as shown on the lines noted by the trial court, is: line 7, $94,801; line 8a, $139; line 9a, $6263; line 10, $16,503; and line 13, a capital loss of $3000. Because the defendant was unemployed and collecting unemployment compensation through the end of the first period, May 31, 2012, we know that his wage income of $94,801 was earned entirely during the second time period, although the additional income of $19,905, as calculated in our analysis of the first time period, was earned throughout the entire year. Taking the $94,801 and dividing it by the number of weeks from June 1 through December 31, 2012, which is thirty, we compute weekly gross wages of $3160. Adding to that the weekly additional income as set forth in our analysis of the first time period of $383 ($19,905 divided by 52 equals $383), we compute a weekly gross income of $3543 for the second time period.

Subtracting from that gross income figure of $3543, the defendant's federal and state 2012 weekly income tax liability of $338, we arrive at $3205. Because the second time period includes wages, rather than unemployment compensation, we also must subtract the amount withheld over those thirty weeks for social security and Medicare taxes, which we find on the defendant's W-2 form, submitted into evidence as part of the defendant's exhibit 15 at trial, of $4175 and $1441, respectively, for a total of $5616 or $187 per week over the thirty weeks that he was employed in 2012. It also is undisputed that the defendant made health insurance payments when he was employed, and, although the precise amount cannot be ascertained from the record,

the court reasonably could have used the figure from 2013 of $1711 per year, which equates to $33 per week. Taking the $3205 (weekly gross income minus taxes) and subtracting the additional deductions (social security and Medicare taxes, and health insurance) of $220, we arrive at a weekly net income of $2985. This weekly net income figure is $4 higher than the court's weekly net income figure for the second period of $2981 and easily can be attributed to differences in rounding. Accordingly, we conclude that the court's net income finding for the defendant for the second time period has an evidentiary basis.

As to the plaintiff's weekly net income for the second time period, the court found that her weekly net income was $1304. This is exactly the same amount as for the first time period, and our analysis of this amount remains the same. Accordingly, we conclude that the court's weekly net income findings for the plaintiff for the second time period have an evidentiary basis.

For the third time period, January 1, 2013 through June 30, 2015, the court found that the plaintiff's weekly net income was $1400 per week, and the defendant's weekly net income was $3321 per week.[12] The court stated that it made these findings on the basis of documents, including the plaintiff's April 29, 2015 financial affidavit, the defendant's April 28, 2015 financial affidavit, the defendant's 2013 federal and state income tax returns, and the May 1, 2015 child support guidelines worksheet prepared by the plaintiff's counsel.

The defendant's 2013 W-2 and earnings summary forms reveal employment income of $230,186. His federal tax return reveals interest of $566, dividend income of $4835, a taxable refund of $2002, and a capital loss of $3000, for an approximate gross income of $234,589; his 2013 federal tax form also shows excess social security tax withholdings of $4453, for a gross income of $239,042. It also shows a federal tax liability of $37,922; his state tax form reveals a state tax liability of $11,291; his W-2 forms also reveal social security tax withholdings of $11,502, Medicare tax withholdings of $3317, and health insurance costs of $1711; this evidence demonstrates that the defendant's net income for 2013 was $173,299 ($239,042 minus $65,743 [$37,922 plus $11,291 plus $11,502 plus $3317 plus $1711] equals $173,299).

On his April 28, 2015 financial affidavit, the defendant certified that his gross income for 2014 was $205,805. His W-2 form shows federal income withholdings of $25,686, social security tax withholdings of $7254, Medicare tax withholdings of $2999, health insurance costs of $1361, and state tax withholdings of $12,034. On the basis of these figures, this evidence demonstrates that the defendant's approximate net income for 2014 was $156,471.[13]

The defendant also certified that his then current

gross income (for 2015) was $4691 per week or $243,932 annually,[14] that his weekly mandatory deductions were $1358 or $70,616 per annum, and that his then current weekly net income was $3333 or $173,316 per annum. Averaging the net income amounts from 2013 through 2015 ($173,299 plus $156,471 plus $173,316 equals $503,086; $503,086 divided by 3 equals $167,695), we arrive at an average net income of $167,695 per annum or $3225 per week, which is approximately $96 less than the court's weekly net income average of $3321. In light of the evidence that the defendant had interest and dividend income every year from 2009 through 2013, and that he consistently had overpaid his taxes, we conclude that it would have been reasonable on the basis of this evidence for the court to have attributed approximately $96 per week in additional income to the defendant. See footnote 13 of this opinion. Accordingly, we conclude that there is an evidentiary basis to support the court's net income finding for the third time period.

As to the plaintiff's net weekly income for the third time period, the court found that her weekly net income was $1400. Her 2013 W-2 form shows that the plaintiff had gross earnings of $102,397, that she paid Medicare taxes of $1485, health insurance of $3000, union dues of $768, and that she made mandatory pension contributions of $7291. Her 2013 federal tax return also shows that the plaintiff had federal income tax liability of $11,984 and state tax liability of $4481. This evidence demonstrates that the plaintiff's net income for 2013 was $73,388.

On her April 29, 2015 financial affidavit, the plaintiff certified that her gross income for 2014 was $117,010, but her December, 2014 paystub shows a year to date gross income from employment of $118,510.[15] The paystub also shows Medicare taxes of $1601, health insurance of $3150, union dues of $814, mandatory pension contributions of $7094, federal income tax payments of $15,456 and state tax payments of $5516. Using the gross income from employment figure on the plaintiff's paystub, we conclude that the evidence demonstrates that the plaintiff's approximate net income for 2014 was $84,879.

The plaintiff also certified that her gross income for 2015 was $2011 per week, or $104,572 annually. She averred that she had mandatory deductions of $688 per week, or $35,776 per annum, giving her a weekly net income of $1323 or $68,796 per annum for 2015. Averaging these three years of net income ($73,388 plus $84,879 plus $68,796 equals $227,063; $227,063 divided by 3 equals $75,688), we conclude that the evidence demonstrates that the plaintiff had an average annual net income for the third time period of approximately $75,688 or $1456 per week. We conclude that the difference of $56 between the court's net income finding

of $1400 and our own calculation is de minimus and certainly could be attributable to rounding adjustments. Accordingly, the court's net income finding for the plaintiff for the third time period has evidentiary support.

2

The defendant also claims that the court improperly determined his child support, arrearage, and expense obligations because it failed to give consideration to his request for a deviation from the presumptive amount of child support. He argues that he presented evidence during the hearing to rebut the presumption that the application of the guidelines was equitable and appropriate in this case, but that the court failed to consider his request for a deviation. We are not persuaded.

"The legislature has enacted several statutes to assist courts in fashioning child support orders. . . . The legislature also has provided [in General Statutes § 46b-215a] for a commission to oversee the establishment of child support guidelines, which must be updated every four years, to ensure the appropriateness of child support awards . . . . The guidelines provide a schedule for calculating the basic child support obligation, which is based on the number of children in the family and the combined net weekly income of the parents. Regs., Conn. State Agencies § 46b-215a-2c (e).

"In support of the application of these guidelines, General Statutes § 46b-215b (a) provides in relevant part: The child support and arrearage guidelines issued pursuant to [§] 46b-215a . . . shall be considered in all determinations of child support award amounts . . . . In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under the deviation criteria established by the Commission for Child Support Guidelines under [§] 46b-215a, shall be required in order to rebut the presumption in such case." (Citation omitted; internal quotation marks omitted.) *Battistotti* v. *Suzanne A.*, 182 Conn. App. 40, 46–47, 188 A.3d 798, cert. denied, 330 Conn. 904,        A.3d       (2018).

Section 46b-215a-5c (b) of the Regulations of Connecticut State Agencies describes the criteria that may justify a support order different from the presumptive support amounts calculated under the child support guidelines. Specifically, it provides as criteria for deviation: (1) other financial resources available to a parent, (2) extraordinary expenses for care and maintenance of the child, (3) extraordinary parental expenses, (4) needs of a parent's other dependents, (5) coordination of total family support, and (6) special circumstances.

The special circumstances deviation criterion in § 46b-215a-5c (b) (6) of the regulations provides the following: "In some cases, there may be special circumstances not otherwise addressed in this section in which deviation from presumptive support amounts may be warranted for reasons of equity. Such circumstances are limited to the following:

"(A) Shared physical custody. When a shared physical custody arrangement exists, it may be appropriate to deviate from presumptive support amounts when: (i) such arrangement substantially . . . (I) reduces expenses for the child, for the parent with the lower net weekly income, or (II) increases expenses for the child, for the parent with the higher net weekly income; and (ii) sufficient funds remain for the parent receiving support to meet the needs of the child after deviation; or (iii) both parents have substantially equal income.

"(B) Extraordinary disparity in parental income. When the custodial parent has high income, resulting in an extraordinary disparity between the parents' net incomes, it may be appropriate to deviate from presumptive support amounts if: (i) such deviation would enhance the lower income parent's ability to foster a relationship with the child; and (ii) sufficient funds remain for the parent receiving support to meet the basic needs of the child after deviation.

"(C) Total child support award exceeds 55 [percent] of obligor's net income.

If the total child support award exceeds 55 [percent] of the obligor's net income, it may be appropriate to deviate downward on any components of the award other than current support to reduce the total award to not less than 55 [percent] of the obligor's net income.

"(D) Best interests of the child.

"(E) Other equitable factors." Regs., Conn. State Agencies § 46b-215a-5c (b) (6). "[T]he decision whether to deviate from the guidelines on the basis of [the criteria] is left to the court's sound discretion. . . . [A] trial court's decision not to deviate from the guidelines does not, a fortiori, demonstrate a failure to consider that criterion." (Citation omitted; internal quotation marks omitted.) *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 858, 74 A.3d 482 (2013).

The defendant specifically contends that he "presented evidence and argued that a deviation was warranted on the following grounds: the parties share physical custody of the minor children; the needs of the children were being met at the then current amount, which amount was based on an agreed upon deviation from the presumptive child support amount; the defendant's agreement in the [parties' agreement] to undertake to pay the children's private educational expenses through eighth grade (estimate to be $141,185); and the

defendant's agreement in the [parties' agreement] to undertake to pay the bulk of the children's expenses (over $30,000, 75 [percent] on unreimbursed)," but that the court failed to address his request for a deviation. (Footnote omitted.)

Here, the defendant asserts that the court failed to address his request for a deviation from the presumptive child support amount even after he submitted evidence and argued that he had established the shared physical custody criterion for a deviation. On the basis of the record, we are not persuaded that the court failed to consider the defendant's request for a deviation.

During closing argument on the motions heard by the court, the defendant's attorney fully explained to the court the defendant's request for a deviation; she fully explained how the parties at the time of dissolution had agreed to a deviation and why the defendant still thought a deviation was warranted. This discussion was extensive. During the discussion, the court also questioned the defendant's attorney about the merits of this request, and it commented extensively on the issue, including stating that "[c]hildren have an absolute right to child support" and that "the parties can agree to a whole host of things from a property settlement, from alimony, for a whole host of things. But, as far as the child support is concerned, the parties are not in a position to waive child support absent the court finding that there is an appropriate deviation criteria."

Furthermore, after the court rendered its decision, the defendant, in his motion to reargue, acknowledged that the court specifically had recognized in its memorandum of decision that shared physical custody is a deviation criterion, and he requested that the court permit reargument on the matter and that it enter new orders. On November 19, 2015, the court held a hearing on this and other matters. During the hearing, the defendant's attorney argued that the court was required to give an explanation of its reasons for either granting or denying a requested deviation. Specifically, he argued: "In the case law, I believe . . . if you ask for a deviation, the court has to explain if they don't give you a deviation. [It must explain] [w]hy? And if they do give you a deviation, [it must explain] [w]hy? But in either [instance], there has to be some articulation, the why you deviated or why you didn't deviate." After hearing argument on the matter, the court agreed to take a second look at the request. The court also stated, and the parties agreed, that if the court found any merit to the defendant's request, it would permit further argument on it. On the basis of the foregoing, we conclude that the record establishes that the court considered the defendant's request for a deviation. Accordingly, the defendant's claim fails.

3

The defendant claims that the court improperly determined his child support, arrearage, and expense obligations because the court modified, rather than clarified, its decision in response to his motion for reargument on his request for a deviation. The plaintiff responds that the court's corrected memorandum of decision was in response to several motions that it heard, including the defendant's motion for reargument and the plaintiff's motion to reconsider. She argues that the defendant cannot complain because the court appropriately responded to the parties' motions, including the defendant's motion in which he specifically requested that the court reconsider the defendant's request for a deviation. We agree with the plaintiff.

After the court issued its August 27, 2015 memorandum of decision, the defendant, on September 16, 2015, filed a motion to reargue. In that motion, the defendant specifically stated that the court, although "mention[ing] in its memorandum of decision that shared custody is a deviation factor," had failed to mention that the parties, at the time of the dissolution, had agreed to deviate from the child support guidelines. The defendant then reiterated that a deviation was warranted on the basis of the parties' shared physical custody agreement, and he asked the court to permit reargument on the matter and that it enter new orders. As we explained in part II A 2 of this opinion, during the hearing, the defendant's attorney specifically argued: "In the case law, I believe . . . if you ask for a deviation, the court has to explain if they don't give you a deviation. [It must explain] [w]hy? And if they do give you a deviation, [it must explain] [w]hy? But in either [instance], there has to be some articulation, the why you deviated or why you didn't deviate."

Thereafter, the court considered the issues raised and submitted a corrected memorandum of decision in which it stated, in relevant part, that it would be "equitable and appropriate *not to deviate* from the child support guidelines" in this case. (Emphasis added.) In light of the defendant's request that the court permit reargument and issue new orders, and his insistence that the court explain its reasons for either granting or denying a deviation, we conclude that the court's response was appropriate. Accordingly, we are not persuaded by the defendant's argument.

4

The defendant also claims that the court improperly determined his child support, arrearage, and expense obligations by abusing its discretion when it determined that it was equitable and appropriate not to deviate from the child support guidelines. He argues that the parties' agreement, as incorporated into the judgment of dissolution, regarding the "shared custody arrangement and the defendant's financial concession *pertaining to*

*the children* were made [on the basis of] there being a deviation from the presumptive support until such obligation terminated under their agreement," and, therefore, the court should not have denied the request for a continued deviation. (Emphasis in original.) He further contends that the plaintiff, herself, recommended an amount of child support that was in deviation from the presumptive amount, and that there is "no support in the record for the trial court to have denied the request for deviation . . . ." The plaintiff responds that the record of the dissolution canvass clearly demonstrates that the "financial concessions" made by the defendant were "made to induce the plaintiff to waive alimony, not deviate child support."[16] She argues that the court properly exercised its discretion in this matter. We agree that the court properly exercised its discretion.

"[A] court may deviate from the presumptive amount of child [support] if the procedures outlined in § 46b-215a-5c of the regulations are followed. Notably, an agreement may provide a sufficient basis for a deviation when the agreement cites deviation criteria; the presumptive amount also 'may be rebutted by a specific finding on the record that such amount would be inequitable or inappropriate in a particular case.' Regs., Conn. State Agencies § 46b-215a-5c (a)." *Robinson* v. *Robinson*, 172 Conn. App. 393, 403, 160 A.3d 376, cert. denied 326 Conn. 921, 169 A.3d 233 (2017). "[O]nce the court enters an order of child support that substantially deviates from the guidelines, and makes a specific finding that the application of the amount contained in the guidelines would be inequitable or inappropriate, as determined by the application of the deviation criteria established in the guidelines, that particular order is no longer modifiable solely on the ground that it substantially deviates from the guidelines. . . . Rather, the party seeking modification must instead show that maintaining a child support order that deviates from the child support guidelines is inequitable or inappropriate as a result of a substantial change in circumstances." (Citation omitted; internal quotation marks omitted.) *Budrawich* v. *Budrawich*, 156 Conn. App. 628, 642–43, 115 A.3d 39, cert. denied, 317 Conn. 921, 118 A.3d 63 (2015). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Battistotti* v. *Suzanne A.*, supra, 182 Conn. App. 44.

In the present case, the court specifically found that a deviation from the presumptive amount of child support would be inappropriate and inequitable. The defendant contends that he was entitled to a continued deviation because he had agreed to assume the costs of the children's private education through eighth grade in light of this deviation and that this was in the parties' shared

physical custody agreement at the time of the dissolution. He contends that the trial court "in a rather rogue fashion, decided sua sponte to undo the mosaic of the parties' stipulated judgment and upset the very delicately balanced and carefully negotiated terms of the parties' stipulated agreement [at the time of the dissolution]."

We have reviewed the record and, although the dissolution court found the parties agreement to be fair and equitable, it did not make a finding on the record that the application of the guidelines would be inequitable or inappropriate at the time it rendered judgment incorporating the parties' agreement. See *Righi* v. *Righi*, supra, 172 Conn. App. 441 (rejecting plaintiff's claim that trial court necessarily found application of guidelines to be inequitable or inappropriate because it found parties' agreement, which included agreement to deviate from guidelines, fair and equitable); see generally *McHugh* v. *McHugh*, 27 Conn. App. 724, 728–29, 609 A.2d 250 (1992) ("[O]nce the court enters an order of child support that substantially deviates from the guidelines, and makes a specific finding that the application of the amount contained in the guidelines would be inequitable or inappropriate . . . that particular order is no longer modifiable solely on the ground that it substantially deviates from the guidelines. By the same token, in the absence of such a specific finding, the order is continually subject to modification on the ground of a substantial deviation from the guidelines." [Footnote omitted.]). In the absence of such a finding by the dissolution court in this case, we conclude that the trial court had the discretion to consider the question of a modification of child support anew, in accordance with the guidelines.

The court, after finding a substantial change in circumstances, which change is not disputed by the parties, examined the record, considered the evidence, and considered the defendant's request for a deviation from the presumptive amount of child support. Finding that such a deviation would be inappropriate and inequitable, and that it would leave the plaintiff with insufficient funds to meet the needs of the children, the court properly exercised its discretion and denied the request.

### B

The defendant next claims that the court abused its discretion by awarding the plaintiff $50,000 for attorney's fees pursuant to paragraph 10.3 of the parties' agreement.[17] The defendant argues that "[t]he underpinning for the award is that the trial court determined the defendant breached [paragraph 5.1 of] the separation agreement. . . . As a result of this alleged breach, the trial court awarded counsel fees . . . ." (Citations omitted.) He contends, however, that he did not breach the agreement and that the court's construction of paragraph 5.1 of the agreement "was not reasonable." Hav-

ing concluded in part I of this opinion that the defendant was in contempt for breaching paragraph 5.1 of the parties' agreement, which had been incorporated into the judgment of dissolution, we conclude that this claim is without merit.[18]

Article 10.3 of the parties' agreement provides in relevant part: "In the event that it shall be determined by a court of competent jurisdiction that either party shall have breached any of the provisions of this Agreement or of any court decree . . . and regardless of whether the party is adjudicated in contempt, the offending party shall pay to the other party reasonable attorneys' fees, court costs and other expenses incurred in the enforcement of the provisions of this Agreement . . . ." Pursuant to article 10.3, the trial court awarded the plaintiff $50,000 for attorney's fees. The defendant now challenges that award as an abuse of the court's discretion.[19]

We set forth the standard of review and applicable legal principles for this claim. "The abuse of discretion standard of review applies when reviewing a trial court's decision to [grant or] deny an award of attorney's fees. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *Munro* v. *Munoz*, 146 Conn. App. 853, 858, 81 A.3d 252 (2013). "The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . This rule is generally followed throughout the country. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . or a statute may confer such rights." (Internal quotation marks omitted.) *Giordano* v. *Giordano*, 153 Conn. App. 343, 352–53, 101 A.3d 327 (2014).

"General Statutes § 46b-87 grants the court the discretion to award attorney's fees to the prevailing party in a contempt proceeding. The award of attorney's fees in contempt proceedings is within the discretion of the court." (Footnotes omitted; internal quotation marks omitted.) *Malpeso* v. *Malpeso*, 165 Conn. App. 151, 184, 138 A.3d 1069 (2016). "[T]he award of attorney's fees pursuant to § 46b-87 is punitive, rather than compensatory . . . ." (Internal quotation marks omitted.) *Allen* v. *Allen*, 134 Conn. App. 486, 503, 39 A.3d 1190 (2012). Additionally, where the parties, in their agreement, have provided for the payment of counsel fees in the event one party is in breach of the agreement, it is proper for

the court to rely on the attorney's fee provision of that agreement, even if it declines to find a party in contempt. *Goold* v. *Goold*, 11 Conn. App. 268, 288–89, 527 A.2d 696, cert. denied, 204 Conn. 810, 528 A.2d 1156 (1987). "[A] contract clause providing for reimbursement of incurred [attorney's] fees permits recovery upon the presentation of an attorney's bill, so long as that bill is not unreasonable upon its face and has not been shown to be unreasonable by countervailing evidence or by the exercise of the trier's own expert judgment." (Internal quotation marks omitted.) *Storm Associates, Inc.* v. *Baumgold*, 186 Conn. 237, 246, 440 A.2d 306 (1982).

In the present case, the parties' agreement provides for the payment of attorney's fees in the event that a court determines "that either party shall have breached any of the provisions of this Agreement or of any court decree . . . and regardless of whether the party is adjudicated in contempt . . . ." The parties' agreement, therefore, authorizes the court to award attorney's fees when one of the parties is in breach of the agreement.

As set forth in part I of this opinion, the court found that the defendant had breached paragraph 5.1 of the agreement. This finding amply is supported by the evidence that the defendant breached the clear terms of the agreement and engaged in self-help. Accordingly, the court did not abuse its discretion in awarding the plaintiff $50,000 in attorney's fees.

C

The defendant next claims that the court abused its discretion in declining to hold the plaintiff in contempt for violating paragraph 11.1 of the parties' agreement on the basis of ambiguity in the language. He contends that the language is not ambiguous, and, even if an ambiguity exists, the court improperly failed to resolve the ambiguity through a determination of the parties' intent before finding that he failed to meet his burden. We are not persuaded.

The following additional facts inform our review. The defendant filed a motion for contempt on December 9, 2013, alleging that the plaintiff had violated paragraph 11.1 of the parties' agreement by claiming the real estate taxes for the marital residence as a deduction on her 2009 income tax return. That provision provides: "The parties shall file separate federal and state income tax returns for the calendar year 2009 however, the parties agree to file joint tax returns for 2006, 2007 and 2008 and will split equally all refunds. The parties shall be entitled to claim the mortgage interest and real property tax deductions with respect to the marital residence for calendar year 2009 to the extent that each party has paid the mortgage and/or real estate taxes. The parties acknowledge that the [defendant] made said payments

for 2009."

The court specifically found that paragraph 11.1 was ambiguous, and that the defendant had failed to prove by clear and convincing evidence that the plaintiff wilfully had violated the provision. In so concluding, the court reasoned, "[o]n the one hand, by the terms of the [agreement], each party is entitled to claim a portion of mortgage and taxes in 2009, and, yet, the wording also seemingly allows the [defendant] to take all." We agree with the court that paragraph 11.1 is ambiguous.

As set forth in part I of this opinion: "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . A contempt judgment cannot stand when, inter alia, the order a contemnor is held to have violated is vague and indefinite, or when the contemnor, through no fault of his own, was unable to obey the court's order. . . .

"Consistent with the foregoing, when we review such a judgment, we first consider the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review." (Internal quotation marks omitted.) *Hirschfeld* v. *Machinist*, supra, 181 Conn. App. 318.

"Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . In contrast, an agreement is ambiguous when its language is reasonably susceptible of more than one interpretation." (Internal quotation marks omitted.) *McTiernan* v. *McTiernan*, 164 Conn. App. 805, 825, 138 A.3d 935 (2016). However, "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Celini* v. *Celini*, 115 Conn. App. 371, 377, 973 A.2d 664 (2009).

The relevant portion of paragraph 11.1 provides: "The parties shall be entitled to claim the mortgage interest and real property tax deductions with respect to the marital residence for calendar year 2009 to the extent that each party has paid the mortgage and/or real estate taxes. The parties acknowledge that the [defendant] made said payments for 2009." We conclude that this language is confusing, leading to ambiguity.

This provision states, in relevant part, that each party is entitled to claim a deduction to the extent that each party has paid the mortgage and/or the real estate taxes for 2009. The provision then contains an acknowledgement that the defendant made such payments in 2009. The provision, however, does not state that the plaintiff

made no such payments or that the defendant exclusively made such payments. In fact, if this provision were meant to convey that the defendant was the only party to have made such payments in 2009, and the provision specifically applies only to 2009, then we question why the provision also specifically allows *each party* to claim the deduction for 2009 to the extent of what each party paid. Nevertheless, we recognize that the provision does contain an acknowledgement that the defendant made such payments while not acknowledging that the plaintiff also made such payments. Accordingly, we agree with the trial court that the provision is ambiguous.

The defendant also contends that even if this language is ambiguous, the court also should have construed the agreement by determining the intent of the parties. We conclude that because the court found that, to the extent that the plaintiff may have breached paragraph 11.1, her breach was not wilful but was based on a good faith misunderstanding of the ambiguous provision, the court had no need to further interpret the provision. See *Parisi* v. *Parisi*, 315 Conn. 370, 379, 107 A.3d 920 (2015) ("[a] contempt judgment cannot stand when, inter alia, the order a contemnor is held to have violated is vague and indefinite").

During trial, the plaintiff testified regarding her preparation of her income tax return for 2009. She confirmed that her income contributed to one third of the marital expenses during 2009, that the parties were living together in the marital residence for the entirety of 2009, and that it was not her intention to violate the court's order. The court, obviously, credited this testimony when it concluded that the defendant had not met his burden to demonstrate that the plaintiff wilfully breached a clear and unambiguous order of the court. We conclude that the court did not abuse its discretion in declining to find the plaintiff in contempt on the basis of an ambiguous provision of which the defendant failed to establish, by clear and convincing evidence, a wilful breach.

D

The defendant's final claim is that the court abused its discretion when it held him in contempt for failing to make certain payments of child support during the months of May through August, 2015, while the parties were awaiting the court's decision on their postjudgment motions. We are not persuaded.

On May 6, 2015, evidence closed in the hearing on the parties' numerous posttrial motions. Approximately two months later, on June 29, 2015, the plaintiff filed a motion for contempt alleging that the defendant had failed to pay any child support since the close of evidence. This motion and others were heard by the court on November 19, 2015. In finding the defendant in con-

tempt for failing to make child support payments from May through August, 2015, the court found that "there was no effort between . . . basically the beginning of May . . . through the end of August . . . . And that strikes me as, again, clear and unequivocal order of the court. There's no question. There's no evidence that he paid during those months. And there was no reason not to pay, and I think that's clear and unequivocal evidence, and I'm going to so find that he is in wilful contempt of a clear and unequivocal order of the court." The defendant claims this was error.

"[W]e first consider the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . . Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding." (Citations omitted; internal quotation marks omitted.) *Parisi* v. *Parisi*, supra, 315 Conn. 380.

As to the first prong of our analysis, the record and our analysis in part I of this opinion make it clear that the orders that underlie the plaintiff's motion for contempt were clear and unambiguous. We need not discuss this prong further.

As to the second prong of our analysis, the record amply supports the court's finding that the defendant's failure to abide by the court's order was wilful. This is especially true in light of the court's admonition during the hearing, specifically on April 29, 2015, that "the order is the order until [it is] changed," that it was "a continuing obligation," that "[it is] incumbent upon the obligor . . . to come back to court," and that a person who engages in self-help acts at his own peril.

As stated previously in this opinion, our law is clear: "An order of the court must be obeyed until it has been modified or successfully challenged." (Internal quotation marks omitted.) *Eldridge* v. *Eldridge*, supra, 244 Conn. 530. "[O]ur Supreme Court [has] stated that [a]lthough one party may believe that his or her situation satisfies [the] standard [of changed circumstance], *until a motion is brought to and is granted by the court, that party may be held in contempt in the discretion of the trial court if, in the interim, the complaining party fails to abide by the support order*." (Emphasis in original; internal quotation marks omitted.) *Nunez* v. *Nunez*, 85 Conn. App. 735, 739–40, 858 A.2d 873 (2004); see also *Eldridge* v. *Eldridge*, supra, 531–32 (good faith belief that party was justified in suspending alimony payment did not preclude finding of

contempt).

On the basis of the record before us, we conclude that it is undisputed that the defendant failed to pay any amount of child support for the months of May through August, 2015. As a result of the defendant's unilateral decision to stop paying child support during this time, it was not an abuse of discretion for the court to find the defendant in wilful contempt.

The judgment is reversed as to the denial of the plaintiff's motion for contempt, number 157, and the case is remanded with direction to grant the plaintiff's motion and for consideration of appropriate sanctions, if any; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Paragraph 5.1 of the agreement provides in relevant part that "the Husband shall during his lifetime pay the Wife the sum of $260.00 per week as and for child support pursuant to the child support guidelines [provided he is employed at the rate of Two Hundred and Five Thousand ($205,000.00) Dollars per year.] The Husband's obligation with respect to each child shall terminate when the child attains age eighteen . . . ."

[2] Although the dissolution court found that the parties' agreement was fair and equitable, the record contains no indication that the court also made a finding that the application of the guidelines would be inequitable or inappropriate.

[3] On February 9, 2012, the plaintiff filed another motion for contempt and a motion for counsel fees, and, on April 4, 2012, she filed a motion seeking the appointment of counsel for the minor children. On April 5, 2012, the defendant filed a motion requesting that the court order the plaintiff to undergo a psychological examination. On April 9, 2012, the plaintiff filed a motion for modification of legal and physical custody of the minor children. Most of these motions were marked off between April and June, 2012. On April 23, 2012, however, the parties did enter into a stipulated agreement regarding the appointment of counsel for the minor children, wherein they agreed to share the cost. There is no indication in the record, however, that counsel appeared on behalf of the children.

[4] Page two of this motion, which contains the grounds thereof, is missing from the trial court file. The plaintiff, however, has included a copy of all three pages of the motion in the appendix to her appellate brief.

[5] This motion is docketed as a motion for contempt. The motion itself, however, is titled as a motion for order, and the defendant did not request in this motion that the plaintiff be found in contempt. Rather, he requested that the court order her to comply with the parties' agreement.

[6] The parties filed several additional motions throughout 2013, 2014, and 2015, some of which were heard and decided at various times, and some of which were marked off. These additional motions are not relevant to our analysis of the issues presented in this appeal or cross appeal.

[7] This motion is titled a motion for fees. On the docket sheet, however, it is listed as a motion for order postjudgment.

[8] The trial court opined, and the parties do not disagree, that this is a typographical error and that it is should say age nineteen (19), in order to comply with General Statutes § 46b-84 (b), which provides in relevant part: "If there is an unmarried child of the marriage who has attained the age of eighteen and is a full-time high school student, the parents shall maintain the child according to their respective abilities if the child is in need of maintenance until such child completes the twelfth grade or attains the age of nineteen, whichever occurs first."

[9] The defendant testified that he hired Karlene Mitchell, a financial advisor, in late December, 2014, to assist him in recalculating his child support obligation. The defendant further testified: "My instructions to her [were] to take all of the . . . financial information on myself, and what sketchy information we had on the plaintiff, and to run child support numbers." The defendant called Mitchell to testify on his behalf, and she stated that she replicated the methodology employed by the parties in negotiating the 2010 agreement in conjunction with the software to calculate the child support guidelines for each time period where the defendant altered his child sup-

port payments.

[10] During the hearing on the motions, the plaintiff's attorney asked the defendant: "You didn't pay any child support for 2012, correct?" The defendant responded: "That's correct." Counsel then asked: "Then, [you] reduced [your payments] between 2013 and the present to $196, $167, $137, correct?" To which the defendant responded: "Yes."

[11] The court specifically stated that it did not include the defendant's 2012 wages of $94,801 in its calculations for the first period because the defendant's employment did not commence until after the first period.

[12] In its memorandum of decision, the court stated that the defendant, in his April, 2015 financial affidavit averred that he earns $178,984 per year from employment. We are mindful that this figure is before the defendant's corporate bonus of approximately $65,000, which the defendant specifically listed on his financial affidavit when calculating his gross income of $4691 per week or $243,932 per annum. The court also stated that the plaintiff averred in her affidavit that her gross income from wages is $104,572. In addition, the plaintiff incorrectly added child support income from the defendant in the amount of $137 per week or $7124 per annum when she calculated her total gross income as $111,696.

[13] There is no tax return in the record for either party for 2014. Although the defendant certified on his financial affidavit that he had *gross income* for 2014 in the amount of $205,805, his W-2 and earnings summary for 2014 provides that his *gross pay* was $205,805. This amount does not include any taxable interest or dividends, however. On the basis of the tax returns in the record, the trial court reasonably could have concluded that the defendant's actual gross income was higher than that which he certified. The record contains tax returns for the defendant for each year from 2009 through 2013. On those returns, the defendant showed taxable interest and dividends of: $13,285 and $7656 in 2009; $2434 and $7771 in 2010; $739 and $8027 in 2011; $139 and $6263 in 2012; and $566 and $4835 in 2013, respectively. He also showed an overpayment of his tax liabilities every year: federal overpayment of $3259, state underpayment of $365 in 2009; federal overpayment of $11,403, Connecticut state underpayment of $139, New York state overpayment of $212 in 2010; federal overpayment of $16,396, state overpayment of $3471 in 2011; federal overpayment of $9365, state overpayment of $1068 in 2012; and federal overpayment of $9576, state overpayment of $797 in 2013. On the basis of this evidence, the court reasonably could have attributed interest and dividend income to the defendant, as well as tax overpayments.

In addition to the gross wages of $205,805 listed on the defendant's W-2 form, the form also lists federal income tax withholdings of $25,686, social security tax withholdings of $7254, Medicare tax withholdings of $2999, and state income tax withholdings of $12,034 (totaling $47,973), which gives us an approximate net income of $157,832 for 2014, but which may be lower than the actual net income because it does not include taxable interest and dividend income, and it may include overpayments of federal and state income taxes.

[14] Similar to the certification of the defendant's 2014 gross income as explained in footnote 13 of this opinion, the certification of $4691 as the defendant's weekly gross income for 2015 does not include taxable interest or dividends.

[15] As stated in footnote 13 of this opinion, the record does not contain a 2014 tax return for either party.

[16] The transcript from the dissolution hearing is in the appellate record. During the hearing, the defendant's attorney offered an explanation of the defendant's agreement to pay the children's private education expenses through eighth grade: "[A]lthough [the defendant] believe[d] [the parties' prenuptial agreement was] enforceable . . . because of the children, he would work out this agreement whereby if there was no alimony . . . the tradeoff was these lump sums and the fact that he would guarantee that [the children's] eighth grade—up through eighth grade education in private school where they are now, which he'll assume, and then high school based on his options." The court then asked: "You mean the trade off for no alimony?" The defendant's attorney responded: "That's right."

[17] The defendant also argues that the court abused its discretion in awarding the plaintiff attorney's fees on the basis of General Statutes § 46b-62. Because we conclude that the court properly awarded attorney's fees for the defendant's breach of the parties' agreement, we need not consider this argument.

[18] We also are mindful that General Statutes § 46b-87 grants the court the

discretion to award attorney's fees to the prevailing party in a contempt proceeding. Because the court awarded the plaintiff attorney's fees under paragraph 10.3 of the parties' agreement, we consider whether that was an abuse of discretion.

[19] The defendant does not challenge the reasonableness of the fees.

---